382 So.2d 461 (1980)
The STATE of Mississippi ex rel. A.F. Summer, Attorney General, and W. Hampton King, Auditor of Public Accounts, for the Use and Benefit of Alcorn County, Mississippi
v.
H.L. DENTON et al.
No. 51766.
Supreme Court of Mississippi.
March 19, 1980.
Rehearing Denied May 7, 1980.
*462 A.F. Summer, Atty. Gen. by R. Lloyd Arnold and J. Stephen Wright, Sp. Asst. Attys. Gen., Jackson, for appellant.
Fisher & Sharp, William L. Sharp, Smith, Downs, Ross, Trapp & Coleman, Orma R. Smith, Jr., Corinth, for appellees.
Before SMITH, SUGG and BOWLING, JJ.
SUGG, Justice, for the Court:
The principal questions presented by this appeal are: (1) Are members of a board of supervisors personally liable for county funds paid to relatives of one of the supervisors in violation of the nepotism statute where the county does not suffer any actual loss because of such unlawful expenditure? (2) Are members of a board of supervisors and their sureties liable for penal damages for paying county funds to relatives of a member of the board of supervisors in violation of the nepotism statute? The answer to the first question is no, and to the second, yes.
The Auditor of Public Accounts and the Attorney General of the State of Mississippi filed suit in the name of the State for the use and benefit of Alcorn County, against past and present members of the Board of Supervisors of Alcorn County and their sureties to recover county funds paid to relatives of a member of the board of supervisors. The complaint also requested the court to assess penal damages against the supervisors and their sureties for paying county funds in violation of the nepotism statute.
During the trial of the case the many facts were stipulated by the parties. Some of the stipulated facts follow.
1. The family of Mickey Jones and Benny Jones bid once a year for the right to haul gravel for Alcorn County. As titular head of the Jones family, Johnny Jones, father of Mickey Jones and Benny Jones, bid for the right to haul gravel for Alcorn County. A number of bids were received annually for the right to haul gravel for Alcorn County. The Jones family bid was accepted.
2. Under this arrangement Mickey Jones and Benny Jones hauled gravel for Alcorn County and were paid individually for their efforts. The gravel hauled by the Jones brothers was used in repairing existing public roads in Alcorn County. They were paid for hauling gravel from Alcorn County public funds and the gravel hauled by them was placed on and became a fixed part of the public roads of Alcorn County.
3. The Jones brothers were subject to county control in hauling gravel in that they were told: (a) where to get the gravel for hauling; (b) where to take it after receiving it; (c) when approximately to have it available; and (d) where to dump the gravel when they arrived at the public road for which the gravel was intended. The gravel was hauled in trucks belonging to the Jones family, and they were paid the bid price for the gravel they hauled.
4. For hauling gravel for Alcorn County, the Jones brothers were paid $4,492 from November, 1974, to January 5, 1976, and $5,910.04 from January 5, 1976 through June, 1977. The Jones brothers are nephews by marriage of D.C. Mathis who was a member of the Board of Supervisors of Alcorn County during the period which was the subject matter of the suit. The Jones brothers are related to D.C. Mathis within the third degree by marriage as computed by the civil law.
*463 5. Each supervisor, except J.W. Morton, knew of the relationship between Mathis and the Jones brothers.
6. Complainants had no evidence that any of the supervisors received any individual personal gain from the county funds paid Mickey Jones and Benny Jones and none of the supervisors voted against contracting with the Jones brothers for hauling gravel for the county.
In addition to the stipulations noted above, the evidence shows that all funds received by the Jones brothers went into the family partnership account.
In support of their position on the first question stated in the opening paragraph of this opinion, complainants argue that the supervisors are liable for the county funds paid to the Jones brothers because the payments were made in violation of one of our nepotism statutes, section 19-13-3 Mississippi Code Annotated (Supp. 1979), and recovery for such expenditures is authorized by section 19-13-37 Mississippi Code Annotated (Supp. 1979). These statutes provide:
19-13-3.
For the performance of any work or for the furnishing of any supplies or materials, it shall be unlawful for any member of the board of supervisors of any county, or any road commissioner of any county or road district whatsoever of any county in this state, to knowingly vote to let any contract to or for the employment by contract, or otherwise, of any relative of any member of the board of supervisors, or any relative of such road commissioner, by blood or marriage within the third degree, computed by the civil law.
However, the prohibition of this section or of any other law against employment of kinsmen shall not apply to any person (a) who shall have been previously employed in the same capacity as the proposed employment on a continuing basis for at least one (1) year prior to the election of the kinsman to the board of supervisors or otherwise as the employing authority and (b) whose continued employment shall have been approved by a majority of the board or other employing authority as shown by resolution spread upon the minutes of the board of such authority.
SOURCES: Laws, 1972, ch. 452, § 1, eff from and after passage (approved May 5, 1972).
19-13-37.
(1) If a board of supervisors shall appropriate any money to an object not authorized by law, the members of the board who did not vote against the appropriation shall be liable personally for such sum of money, to be recovered by suit in the name of the county, or in the name of any person who is a taxpayer suing for the use of the county, and such taxpayer shall be liable for costs in such case.
The individual members of all boards of supervisors, boards of trustees and directors of public water supply districts and all other special service districts, created and existing under the laws of the State of Mississippi, causing any public funds to be expended, any contract made or let, any payment made on any contract or any purchase made, or any payment made, in any manner whatsoever, contrary to or without complying with any statute of the State of Mississippi, regulating or prescribing the manner in which such contracts shall be let, payment on any contract made, purchase made, or any other payment or expenditure made, shall be liable, individually, and upon their official bond, for compensatory damages, in such sum up to the full amount of such contract, purchase, expenditure or payment, as will fully and completely compensate and repay such public funds for any actual loss caused by such unlawful expenditure.
(2) In addition to the foregoing provision, for any violation of any statute of the State of Mississippi prescribing the manner in which contracts shall be let, purchases made, expenditure or payment made, any public official who shall substantially depart from the statutory method of letting contracts, making payments thereon, making purchases or expending public funds shall be liable, individually *464 and on his official bond, for penal damages in such amount as may be assessed by any court of competent jurisdiction, up to the sum of five thousand dollars ($5,000.00).
(3) Any sum recovered under the provisions hereof shall be credited to the account from which such unlawful expenditure was made.
SOURCES: Laws, 1974, ch. 444, §§ 1-3, eff from and after passage (approved March 26, 1974).
Before section 19-13-37 was amended in 1974 it consisted only of the first paragraph of section (1). Liability of supervisors for wrongful or irregular appropriations of public funds under the statute was first addressed by the Court in Paxton v. Baum, 59 Miss. 531 (1882). In that case taxpayers of Warren County filed suit for the use of the county against A.J. Arthur, supervisor for the First District, and J.F. Baum and others, sureties upon his official bond. A demurrer was filed on three grounds. One of the grounds of demurrer was that nearly all of the appropriations alleged as breaches were not "to objects not authorized by law." The Court stated:
The question is as to the interpretation of the expression "object not authorized by law." The objects to which money in the county treasury may be appropriated are designated by law, and it is not legally appropriable to any other purposes. If it is appropriated by the board of supervisors to some other object than is authorized by law, members are liable personally for it, unless they voted against such appropriation. It is for money appropriated to something for which the law does not permit it to be appropriated at all, in any way or under any circumstances, that members are personally liable. It is for a diversion of money from its legitimate objects, and not for appropriation to a proper object, although in an irregular or unauthorized manner, that liability is imposed on members personally. It is what the money is appropriated to, and not how it is applied, that furnishes the test of personal liability for it. "Object" signifies the thing aimed at, the end sought to be accomplished. If this is not the true interpretation of the language mentioned, members of the boards of supervisors would be liable personally for every mistake or error of judgment or of information as to facts whereby money was appropriated even to proper objects, if not appropriated in strict accordance with law as to every circumstance attending it. Either members of the boards of supervisors are personally liable for every appropriation not made in strict conformity to law, or they are not liable except for a diversion of public money from authorized objects and its appropriation to such as are not authorized. The objects to which the boards may appropriate money are designated by law, and may be known to them; and, in all cases of doubt, they may resolve the doubt against the appropriation, and avoid risk of liability; and it may be supposed that for appropriations to objects not authorized by law, it was intended to make members of the boards of supervisors personally liable. But, in view of the well-settled rule of the common law that for errors or mistakes a public officer acting judicially or quasi judicially is not liable, it could not have been the purpose of the legislature to make members of boards of supervisors personally liable for errors or mistakes as to how to act in matters committed to such boards by law, and as to objects for which an appropriation of money is authorized to be made by them. It is when they disregard the law as to the objects to which it has devoted the public money and divert it to some object to which the law has not devoted it, that personal liability attaches. (59 Miss. at 536, 537).
On suggestion of error the Court noted there was no allegation of corruption in the declaration but judicial officers of all grades are liable for their corrupt judgments. The Court then held that supervisors in passing upon claims against the county are acting as judicial officers and stated:
But we cannot ignore the fact that supervisors, in the discharge of many of their *465 functions, are judicial officers, and especially so in adjudicating upon the validity of claims against the county. A law which would make them personally liable for every erroneous judgment rendered, if constitutional, could certainly have the effect of preventing any solvent man from accepting the office, or of becoming the surety of those who did. (59 Miss. at 539).
The Court concluded its opinion with these words:
Manifestly it is impossible, after we pass the point of corruption, to draw any line other than that laid down by us, namely, liability where the subject-matter of the appropriation is beyond the jurisdiction of the board; non-liability where the object is within the jurisdiction, but there has been a mistaken exercise of legal power. Within this limit, every case must depend upon its own facts. (59 Miss. at 540).
The principles announced in Paxton v. Baum have been followed without exception and without judicial erosion of the principle laid down to this date. One of the latest cases following the principles enunciated in Paxton is Entrican v. King, 289 So.2d 913 (Miss. 1974). The case was decided on January 28, 1974 and in it we suggested that, if the legislature intended to impose personal liability in cases such as this, the statute should be amended to effect this purpose. We stated:
No loss was suffered by Lincoln County and all of the expenditures were devoted to objects clearly authorized by law and the Legislature has not enacted any statute imposing personal liability in cases such as this. We are forced, therefore, to conclude that no such liability exists. The Legislature may, if it should see fit to do so, impose personal liability in such a case, merely by inserting in section 9118-15 a provision similar to that appearing in section 9118-10. But unless and until this is done, the statute must be construed as written.
.....
But, under the circumstances of this case and for the reasons stated in this opinion, we are forced to conclude that the Legislature has not seen fit to impose personal liability and therefore, under the decisions of this Court the common law rule that no such liability exists must prevail. (289 So.2d at 917, 918).
The legislature responded to Entrican and amended section 19-13-37 by Chapter 444 Mississippi General Laws of 1974; effective March 26, 1974, so that the statute now reads as set forth above. Section (1) of the amended statute imposes liability on members of all boards of supervisors and other public officials for any actual loss arising from unlawful expenditures as delineated in section (1).
Under section 19-13-3 payment of county funds to the Jones brothers for hauling gravel was illegal because of their relationship to one of the supervisors within the degree proscribed by the statute; however, this fact standing alone does not subject the supervisor to personal liability for the unlawful expenditure. The amended statute imposes personal liability for compensatory damages only in cases where an actual loss occurs because of the unlawful expenditure. In this case the gravel hauled by the Jones brothers was delivered to Alcorn County, was placed on the roads of Alcorn County, and no loss to the county was shown. We therefore conclude, under the facts in this case, that the supervisors were not personally liable for compensatory damages for county funds paid the Jones brothers in violation of the nepotism statute.
Section (2) of the amended statute (19-13-37) deals with the second question stated in the opening paragraph of this opinion. It makes the supervisors and their sureties subject to penal damages for substantially departing from the statutory method of letting contracts, making payments thereon, making purchases, or expending public funds. Unlike the compensatory damage paragraph of the statute, this paragraph does not require a showing of actual loss as a condition precedent to recovering penal damages.
*466 All of the county funds paid to the Jones brothers were in violation of the nepotism statute (19-13-3) and thus unlawful. This constituted a substantial departure from the statutory method of letting contracts, making payments thereon, and expending public funds as contemplated by the amended statute. We hold the supervisors and their sureties are liable for penal damages under 19-13-37(2). We therefore reverse and remand for imposition of penal damages in accord with the statute.
Complainants also argue that the supervisors are liable under section 19-13-37 because their actions in this case were a substantial departure from the statutory method of making payments on contracts as set forth in Section 19-13-15 Mississippi Code Annotated (Supp. 1979), which provides in part:
The board of supervisors shall never make a payment to any contractor for building or repairing a bridge, or for doing any work on a public road, public building or other public work, where the contract price exceeds two hundred dollars ($200.00) but is less than one thousand dollars ($1,000.00), without first having the same inspected and accepted by a committee, and having the certificate of the committee, under oath filed and entered on the minutes of the board. Such committee shall be appointed by the board of supervisors for that purpose and shall consist of at least two (2) members of the board of other districts than the one in which the work is done.
We are of the opinion that the contractor referred to in section 19-13-15 refers to the successful bidder on bids let under section 19-3-9 Mississippi Code Annotated (Supp. 1979) where bids are based on plans and specifications on file with the clerk of the board of supervisors. We do not think the term "contractor" refers to individuals who perform minor tasks in the day to day maintenance of the public roads of a county.
The bid of the Jones family was to haul gravel and dump it on the roads of Alcorn County. The stipulation shows that the Jones family was subject to county control in hauling gravel because they were told where to obtain the gravel, where to take it after receiving it, when to have it available, and where to dump it. In some instances a small amount of gravel would be dumped to fill a pothole in the road. The Attorney General was of the opinion that if one load of gravel was sufficient to complete a project (fill a pothole) the statute applied and it would be the duty of the board of supervisors to appoint a committee to inspect that pothole. Such construction would require the inspectors appointed by the board of supervisors to follow each gravel truck and inspect every pothole or rut filled on county roads. Certainly, the legislature never intended to impose a burden of this magnitude upon the board of supervisors. Accordingly, we hold that, under the facts in this case, section 19-13-15 has no application and the supervisors were not guilty of a substantial departure from the statutory method of making payments on contracts.
An additional question requires discussion. This is whether the defendants established a "good faith" defense under section 7-5-25 Mississippi Code Annotated (1972). Before the first bid was awarded to Johnny Jones, the father of Mickey Jones and Benny Jones, to haul gravel for Alcorn County, H.L. Denton, Supervisor of the First District, raised the question of the legality of the Jones family hauling gravel because of their relationship to D.C. Mathis, member of the Board of Supervisors. Denton requested the attorney for the Board of Supervisors to obtain an opinion from the Attorney General. The attorney for the board testified that sometime in November, 1974, he called the Attorney General's office in response to the request of Mr. Denton to ascertain if the board could legally enter into a contract with the Jones family for hauling gravel. He did not remember who he talked with in the Attorney General's office but said that the person indicated, "That we shouldn't be concerned with it and from that point on, I wasn't and gave no further thought to it until three years later when the issue arose again."
*467 On July 19, 1977, after all payments had been made to the Jones brothers, the attorney requested an opinion from the Attorney General, and on July 22, 1977, received the following opinion:
Attorney General Summer has received your letter of July 19, and assigned it to me for research and reply, your letter stating:
"I would appreciate your opinion as to the law relevant to the following facts: D.C. Mathis, a member of the Alcorn County Board of Supervisors, and Johnnie Jones, a vendor of Alcorn County, married sisters. The sons of Johnnie Jones are also vendors of Alcorn County. There is no blood relationship between any of the parties, merely a relationship by marriage. The following question is the specific point which we would appreciate your immediate attention to due to urgent circumstances.
"Do the facts as related above concerning the relationship by marriage constitute a violation of the Nepotism Statutes of the State of Mississippi."
The applicable Nepotism Statute is Section 19-13-3, Mississippi Code (1972) which reads:
"For the performance of any work or for the furnishing of any supplies or materials, it shall be unlawful for any member of the board of supervisors of any county, or any road commissioner of any county or road district whatsoever of any county in this state, to knowingly vote to let any contract to or for the employment by contract, or otherwise, of any relative of any member of the board of supervisors, or any relative of such road commissioner by blood or marriage within the third degree, computed by the civil law."
The fact that two men had married sisters does not create any relationship between those two men within the prohibition of the Nepotism Statute. Mrs. Jones is Mr. Mathis' sister-in-law but that does not make Mr. Jones Mr. Mathis' brother-in-law so as to establish a nepotism relationship prohibited between those related "by blood or marriage with the third degree, computed by the civil law" as above set out.
Section 7-5-25 Mississippi Code Annotated (1972) provides that the Attorney General shall give his opinion in writing to certain officials of the State of Mississippi, including attorneys for the boards of supervisors. The section provides:
When any officer, board, commission, department, or person authorized by this section to require such written opinion of the attorney general shall have done so and shall have stated all the facts to govern such opinion, and the attorney general has prepared and delivered a legal opinion with reference thereto, there shall be no liability, civil or criminal, accruing to or against any such officer, board, commission, department or person who, in good faith, follows the direction of such opinion and acts in accordance therewith unless a court of competent jurisdiction, after a full hearing, shall judicially declare that such opinion is manifestly wrong and without any substantial support. No opinion shall be given or considered if said opinion is given after suit is filed or prosecution begun.
SOURCES: Codes, 1892, § 183; 1906, § 189; Hemmingway's, 1917, § 3477; 1930, § 3663; 1942, § 3834; Laws, 1930, ch. 154; 1940, ch. 249.
It is noted that the written opinion does not refer to the relationship of Mickey and Benny Jones but only responds with reference to the relationship of their father, Johnny Jones, to D.C. Mathis.
The Attorney General testified that the opinion did not refer to the children of Johnny Jones because the letter requesting the opinion did not state that the two sons were also the sons of Johnny Jones' present wife. The Attorney General observed that they could have been sons by a previous marriage so, not having any of that information in the letter, the question was answered solely with respect to Johnny Jones. He also stated that it was the practice of the Attorney General's office to answer questions as "we perceive the question" and *468 then, if the question is not fully answered, another request is made and an answer given. It was not the practice of his office to volunteer an answer to a question not specifically asked. The opinion did not discuss the relationship which existed between the Jones brothers and Supervisor Mathis. The Jones brothers, together with their father, Johnny Jones, were the partners in a family partnership and all funds received by the Jones brothers for hauling gravel went into the family partnership account.
Section 7-5-25 requires opinions of the Attorney General to be in writing and in this case none was requested or given until after all payments were made to the Jones family. The statute makes no provision for an oral opinion of the Attorney General and parties may not rely on the good faith defense provided in the statute based on an oral opinion from the Attorney General. Furthermore, the opinion does not support a good faith defense because it does not refer to the relationship which existed between the Jones brothers and Supervisor Mathis.
A former Attorney General issued an opinion on August 9, 1940, covering the nepotism statute in question in this case. Opinions of the Attorney General 1939-1941, page 94. In this written opinion the Attorney General stated that the board of supervisors cannot award a contract to a person related to a member of the board or to the county road commissioner within the degree proscribed by statute even though such relative is the lowest responsible bidder. We find no opinion following 1940 which changes the above ruling of the Attorney General and none has been cited. We are therefore of the opinion that the defendants did not establish a good faith defense under section 7-5-25 protecting them from the assessment of penal damages in this case.
Section 7-5-25 provides that opinions of the Attorney General may be determined to be manifestly wrong by a court of competent jurisdiction. Although not necessary for a decision in this case, we deem it advisable to determine whether the opinion of July 22, 1977, is manifestly wrong in holding that Johnny Jones is not related to D.C. Mathis by virtue of the fact they married sisters. This question needs to be answered for the future guidance of supervisors so they can know if a contract violates the nepotism statute.
We have never addressed the question of whether men who marry sisters are related by marriage. The Supreme Court of Louisiana considered this question in the case of State v. Foster, 112 La. 533, 36 So. 554 (1904), when it was construing its statute on judges recusing themselves in cases before them. The statute provided: "Fourth  his being father-in-law, son-in-law, or brother-in-law of one of the parties." In the Louisiana case the presiding judge recused himself on the ground that he and one of the parties were brothers-in-law because they had married sisters and the Supreme Court concurred in this finding. We also note that one definition of brothers-in-law according to Webster's International Dictionary (3rd Ed.) is, "broadly, the husband of one's spouse's sister." This is simply another way of saying that men who have married sisters are brothers-in-law.
We recognize there is authority to the contrary in other jurisdictions, but believe that the sounder rule is that men who marry sisters are brothers-in-law and are related within the second degree by marriage. Section 165 of the Mississippi Constitution of 1890 requires judges to recuse themselves in cases where the parties or either of them shall be connected with him by affinity or consanguinity. Certainly, we would not hold that a judge could preside over a trial where he and one of the parties had married sisters, without the consent of the judge and the parties.
REVERSED AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION TO ASSESS PENAL DAMAGES AGAINST THE DEFENDANTS.
PATTERSON, C.J., SMITH and ROBERTSON, P. JJ., and WALKER, BROOM, LEE, BOWLING and COFER, JJ., concur.