599 So.2d 529 (1992)
Jimmy SMITH, Calvin C. Williams, Bennie Knox and Daniel Jennings
v.
Rev. James DORSEY, John E. Walls, Jr., Carl R. Brandon, Gussie P. Wilson, Harriet Aikerson and Roosevelt Yarbrough.
No. 07-CA-59273.
Supreme Court of Mississippi.
April 16, 1992.
*530 Kennie E. Middleton, Fayette, for appellant.
*531 Dennis L. Horn, Horn & Payne, Jackson, Richard T. Watson, Natchez, for appellee.
Michael C. Moore, Atty. Gen., Larry E. Clark, Asst. Atty. Gen., Jackson, Everett T. Sanders, Natchez, W. David Watkins, Dorian E. Turner, Brunini Grantham Grower & Hewes, Donald Clark, Jr., Crosthwait Terney Noble & Allain, R. Mark Hodges, George Q. Evans, Wise Carter Child & Caraway, W. Larry Harris, Gerald & Brand, William F. Roberts, Ben J. Piazza, Jr., Watkins Ludlam & Stennis, Jackson, for amici curiae.
En Banc.

ON PETITION FOR REHEARING
DAN M. LEE, Presiding Justice, for the Court:

I. INTRODUCTION
An earlier opinion by this Court was released on September 4, 1991, and a petition to rehear was filed by the appellants on September 23, 1991. The petition to rehear is granted; our earlier opinion of September 4, 1991, is withdrawn and held for naught, and we substitute the following opinion in its stead.
This appeal had its origin in a bifurcated proceeding from a complaint filed in October of 1986 by the Rev. James Dorsey and others, individually, and as taxpayers of Claiborne County against members of the Board of Trustees of the Claiborne County School District.
At some time between the filing of the complaint and a trial in late December of 1987 and January of 1988, the State of Mississippi, ex rel., Edwin Lloyd Pittman, Attorney General, and the Mississippi Ethics Commission intervened with permission of the court as plaintiffs in part I of the suit which concerned violations of section 109 of the Mississippi Constitution. However, the Attorney General and the State Ethics Commission are not parties to this second half (part II) of the suit which concerns misappropriation of school funds.
Part I of this proceeding was decided by this Court in August of 1988, and is reported as Smith v. Dorsey, 530 So.2d 5 (Miss. 1988) (the late Ruble Griffin, Justice, for the Court). In part I, this Court held that a school board could not enter into a teaching contract with the spouse of a board member since such would be violative of art. IV., § 109 of the Mississippi Constitution of 1890, but we declined to require the non-party spouses to make restitution for compensation received in the course of their employment, absent some showing of bad faith by the board members. Smith v. Dorsey, 530 So.2d 5, 9 (Miss. 1988).
As noted, this appeal before the Court in part II of this suit concerns an attempt by the taxpayer plaintiffs to establish that members of the Claiborne County Board of Trustees have engaged in illegal conduct in their application and expenditure of school funds. The plaintiffs, Rev. James Dorsey, John E. Walls, Jr., Carl R. Brandon, Gussie P. Wilson and Harriet Aikerson are adult citizens and taxpayers of the Claiborne County School District. Mr. Roosevelt Yarbrough, plaintiff, is a citizen of the Claiborne County School District and is a duly elected member of the Board of Trustees for the school district. Mr. Yarbrough elected to become a party plaintiff in this case, and the defendants are the remaining members of the school district's Board of Trustees. Dr. Jimmy Smith, defendant, is the president of the Board of Trustees, Claiborne County School District, and Daniel Jennings, Calvin C. Williams and Bennie Knox are the remaining board members also named as defendants in both their individual and official capacities.
A trial was held on the issues which are the subject of this appeal by the Hon. Joseph Zuccaro on December 15, 1986, and January 14-15, 1987. Nine months later, Chancellor Zuccaro entered an "ORDER AND DECISION OF THE COURT". This decision held that the State of Mississippi was entitled to recover funds from Claiborne County Board of Education members who voted affirmatively for certain expenditures. Following this opinion by Chancellor Zuccaro, a "FINAL JUDGMENT" was entered by Chancellor Zuccaro's successor, the Hon. Hyde Rust Jenkins, II, on December 3, 1987. This "FINAL JUDGMENT" *532 granted relief based on the opinion by Chancellor Zuccaro and empowered the State of Mississippi to recover funds from members of the Claiborne County Board of Education who voted affirmatively for the following expenditures:
1. The payment of $34,725.00 to State Senator James Disharoon and $17,000.00 to Mrs. Terri Disharoon for their assistance to the board as consultants in an effort to pass a bond issue in Claiborne County.
2. The purchase of two activity buses in February and July of 1985, costing $170,400.00 and $176,254.00, respectively (totaling $346,654.00), as unauthorized by law and violative of §§ 37-41-7, -81, -85 and -101 of the Mississippi Code.
3. The payment of $266,148.00 and accrued interest of public funds which the Claiborne County Board of Education placed with the First National Bank of Vicksburg as a performance bond for a private construction company which was building housing units in Minden, Louisiana.
4. The payment of $9,427.50 for a documentary concerning a school bond referendum.
5. The expenditure of $944.03 for a fish fry in connection with a bond referendum.
6. The payment of $21,548.92 to campaign workers in regard to the bond referendum promotion.
Additionally, Chancellor Jenkins awarded punitive damages, attorneys' fees and an expert's fee. The final judgment awarded $1.00 in punitive damages, $20,088.00 and $5,550.00, respectively, in attorneys' fees and $5,000.00 for an accountant's expert witness fee.
Following the entry of final judgment in December of 1987, an appeal was taken to this Court.
The appellant school board members list three (3) "assignments of error" in their statement of issues which receive no mention in their brief. They are as follows:
1. THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN THAT IT DENIED THE MOTION OF THE DEFENDANTS TO REOPEN THE CASE FOR FURTHER TESTIMONY AND EVIDENCE.
2. THE FINAL JUDGMENT OF THE TRIAL COURT IS CONTRARY TO THE LAW AND AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.
3. THE PROCEEDINGS IN THE TRIAL COURT DENIED THE APPELLANTS THEIR RIGHTS TO DUE PROCESS AND EQUAL PROTECTION UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.
Not only do the appellants fail to cite any authority to support the three propositions, but they also decline to devote any discussion or attention whatsoever to these alleged errors. Therefore, this Court is unable to assess these issues on the merits. The failure to cite any authority can be treated as a procedural bar, and this Court is under no obligation to consider the assignments. R.C. Petroleum, Inc. v. Hernandez, 555 So.2d 1017, 1023 (Miss. 1990); Brown v. State, 534 So.2d 1019, 1023 (Miss. 1988); Shive v. State, 507 So.2d 898 (Miss. 1987); Read v. Southern Pine Elec. Power Ass'n, 515 So.2d 916 (Miss. 1987); Devereaux v. Devereaux, 493 So.2d 1310 (Miss. 1986); Pate v. State, 419 So.2d 1324 (Miss. 1982).
There are five (5) assignments of error which we do address in this opinion. Each assignment has its own distinct factual basis, and the analysis of each error will be introduced by a review of the pertinent facts. The assignments of error are as follows.
THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN ITS FINDINGS AND RULING THAT THE STATE OF MISSISSIPPI IS ENTITLED TO RECOVER OF AND FROM THE MEMBERS OF THE BOARD OF EDUCATION OF CLAIBORNE COUNTY, MISSISSIPPI, WHO VOTED AFFIRMATIVELY ON THE FOLLOWING EXPENDITURES:

*533 (a) THE PAYMENT OF $34,725.00 TO STATE SENATOR JAMES DISHAROON AND $17,000.00 TO MRS. TERRI DISHAROON WHICH THE COURT FOUND WAS IN FURTHERANCE OF THE PASSAGE OF A BOND ISSUE IN CLAIBORNE COUNTY, MISSISSIPPI.
(b) THE SUM PAID FOR THE PURCHASE OF TWO ACTIVITY BUSES ON FEBRUARY 18, 1985, AND JULY 12, 1985, FOR $170,400.00 AND $176,254.00, RESPECTIVELY, A TOTAL OF $346,654.00.
(c) THE SUM OF $266,148.00 (PLUS ACCRUED INTEREST) IN PUBLIC FUNDS WHICH WERE PLACED BY THE CLAIBORNE COUNTY SCHOOL BOARD IN THE FIRST NATIONAL BANK OF VICKSBURG, AND WHICH SAID BANK HAS INTERPLED INTO THE REGISTRY OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF MISSISSIPPI IN THE CASE OF FIRST NATIONAL BANK OF VICKSBURG, MISSISSIPPI V. UNITED STATES DEPARTMENT OF HOUSING & URBAN DEVELOPMENT, ET AL., CIVIL ACTION NO. W086-0112(B).
(d) THE PAYMENT OF $9427.50 FOR A DOCUMENTARY TO PROMOTE A SCHOOL BOND REFERENDUM; THE EXPENDITURE OF $944.03 FOR A FISH FRY IN CONNECTION WITH THE PROMOTION OF A BOND REFERENDUM; THE PAYMENT OF $21,548.92 TO CAMPAIGN WORKERS IN REGARD TO THE BOND REFERENDUM PROMOTION.
(e) THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN AWARDING PUNITIVE DAMAGES IN THE AMOUNT OF $1.00; ATTORNEYS' FEES IN THE AMOUNT OF $20,088.00 AND $5550.00, RESPECTIVELY, FOR TWO ATTORNEYS, AND $5000.00 FOR AN EXPERT WITNESS FEE.
After careful study and an exhaustive review of the record, we affirm in part and reverse in part, the final judgment entered by the chancellor in this case on December 3, 1987.

Standard of Review
Our standard of review in this case is two-fold. After a trial on the merits in the Claiborne County Chancery Court, the chancellor made factual findings regarding the nature of various expenditures by the local school board. As it will become apparent, these findings of fact will be crucial to our disposition of the case. This Court always reviews a chancellor's findings of fact, but we do not disturb the factual findings of a chancellor unless such findings are manifestly wrong or clearly erroneous. Bowers Window and Door Co., Inc. v. Dearman, 549 So.2d 1309 (Miss. 1989). This standard has also been explained as follows. Whenever there is substantial evidence in the record to support the chancellor's findings of fact, those findings must be affirmed here. Johnson v. Hinds County, 524 So.2d 947, 956 (Miss. 1988); Culbreath v. Johnson, 427 So.2d 705, 707-08 (Miss. 1983). If a chancellor fails to make findings on issues of fact, this Court assumes that the issues were resolved in favor of the appellee. Bryant v. Cameron, 473 So.2d 174, 179 (Miss. 1985).
In this appeal, the Court is also passing on a chancellor's conclusions of law as applied to several unrelated factual settings. Thus, the Court is determining the legality, or not, of challenged expenditures made by the Claiborne County Board of Education. For questions of law, our standard of review is de novo. Harrison County v. City of Gulfport, 557 So.2d 780, 784 (Miss. 1990); Cole v. National Life Ins. Co., 549 So.2d 1301, 1303 (Miss. 1989); Busching v. Griffin, 542 So.2d 860, 863 (Miss. 1989); Boggs v. Eaton, 379 So.2d 520, 522 (Miss. 1980).

II. THE LEGALITY OF THE EXPENDITURES

A. THE DISHAROON CONTRACTS

The minutes of the Board of Education meeting for September 12, 1985, reflect the following. Mr. Bennie Knox moved, and it was seconded by Mr. Calvin Williams, that the Board enter into a contract for consulting services with State Senator James Disharoon *534 at the rate of $75.00 per hour, from September 9, 1985, to December 31, 1985. At the same meeting Mr. Knox and Mr. Williams moved that Terri Disharoon, the Senator's wife, be employed by the school board in a contract agreement for consulting services at the rate of $50.00 per hour from September 9, 1985, until December 31, 1985. The Board minutes reflect that the vote was unanimous.
The record contains warrants which show nine payments to Terri Disharoon totaling $17,000.00, and nine payments to James Disharoon totaling $34,725.00. Separate contracts were executed with the Disharoons, but the terms were identical except for the rate of pay. Both contracts describe the Disharoons as consultants for a period of September 9 through December 31, 1985. The contract payments were to be paid solely from local school district tax revenues and not from state sources. In addition to the rate of pay, the Board agreed to reimburse the Disharoons for all reasonable and necessary expenses incurred pursuant to the duties of the contract.
It is to be remembered that the Disharoons were not made parties to this suit. Furthermore, neither Senator Disharoon nor Mrs. Disharoon testified at the trial in this cause. The duties in the contract were described as follows:
(a) To provide public relations advice and counsel in the furtherance of the interest of the Claiborne County Public Schools;
(b) To aid and assist in the development of [sic] plan to improve the quality of the education program and of the educational facilities operated by the Board;
(c) To prepare and participate in public forums, debates and other similar activities in the furtherance of the strengthening of the educational programs operated by the Board;
(d) To consult with and advise school officials employed by the Board with regard to programs to enhance its educational program and to improve the development of its educational facilities;
(e) To advise and counsel with school officials and other consultants and agents of the Board with respect to the development of a long range school facilities plan and the financing of the same;
(f) And other such duties as may be prescribed by the Board from time to time.
At the trial, Dr. John Noble, Superintendent of Education for Claiborne County, testified about the Disharoon contracts. Dr. Noble stated that he could not remember what the Disharoons actually did to earn their consulting fees. Dr. Jimmy Smith, a former school board member for twelve (12) years, from January of 1975 until January of 1987, testified that Terri Disharoon was hired because she had a background in public relations and she would be an asset in the white community in promoting a bond referendum for new school buildings. There is simply nothing in the record to indicate what the Disharoons did in connection with their consulting and public relations advice to the school board other than the language of the contract itself.
The school board argues that it has the statutory authority to employ consultants as non-instructional personnel under Miss. Code Ann. § 37-9-3. At the time of the Board's hiring of Jay and Terri Disharoon in September of 1985, section 37-9-3 stated the following:
Within the limits of available funds, the boards of trustees of all school districts, including municipal separate school districts, may select, employ and appoint all non-instructional personnel, and may prescribe the duties and fix the compensation thereof. Such compensation may be paid either from the allotments made to the school district for `other current cost' from minimum education program funds or from any available funds of such school district other than minimum education program funds.
Miss. Code Ann. § 37-9-3 (1972). (emphasis added).
In September of 1985, section 37-9-1 defined a "non-instructional employee" as, "all employees of school districts other than superintendents, principals, teachers, and school bus drivers." Miss. Code Ann. § 37-9-1 (1972) (emphasis added). The school board rests on the argument that *535 public relations consultants are non-instructional employees by the clear definition of the statute, and section 37-9-3 empowers and authorizes the school board to hire the Disharoons as public relations consultants.
No case could be found in which this Court has interpreted or construed the term "non-instructional personnel." Our research revealed that the term, "non-instructional personnel," was first introduced in the 1953 session laws and was defined as, "all employees of school districts other than superintendents, principals, teachers, and school bus drivers." Gen.Laws, House Bill No. 11, ch. 20, § 1 at 94, (1953 Extraordinary Session). This is the same definition that was in effect in 1985, when the consulting contracts with the Disharoons were made. In 1987, the legislature amended this definition to include, "all employees of school districts other than superintendents, principals and certificated employees." Miss. Code Ann. § 37-9-1 (Revised 1990).
Therefore, the legislature defined the term, "non-instructional personnel," almost forty years ago and has amended this definition only once. By statutory definition, public relations consultants (being neither superintendents, principals, teachers or school bus drivers) are "non-instructional personnel." Miss. Code Ann. § 37-9-1 (1972). Section 37-9-3 grants authority to the school district to employ non-instructional personnel, describe their duties, and fix the rate of compensation. Miss. Code Ann. § 37-9-3 (1972 and Revised 1990). The legislature is certainly free to narrow its scope and definition of non-instructional personnel and to place some restraints as it sees fit on a school district's utilization of such personnel.
Here, we conclude nothing more than that a school district's employment of consultants as non-instructional personnel does no violence to the statutory law of this State. However, this conclusion in no way suggests that all contracts formed between school boards and consultants are valid and enforceable. Regarding the employment of the Disharoons by the Claiborne County Board of Trustees, a separate and distinct yet much larger question looms above. Could the school board enter into a valid and enforceable contract with the Disharoons in order to promote the passage of a bond referendum for new school buildings in Claiborne County? The short answer is, no.
Although we do not have the benefit of the Disharoons' testimony at the trial of this case, Dr. Smith testified that the Disharoons were hired to promote and campaign for the passage of a bond referendum in Claiborne County. This record leaves no doubt and offers nothing to contradict the lower court's explicit finding of fact that the Disharoons were hired to assist with the passage of the bond referendum.
[T]he State of Mississippi is entitled to recover of and from the members of the Board of Education of the Claiborne County, Mississippi who voted affirmatively in favor of expenditures hereinafter set forth, to-wit:
(a) The payment of Thirty-four Thousand Seven Hundred Seventy-five Dollars ($34,775.00) to State Senator James Disharoon and Seventeen Thousand Dollars ($17,000.00) to Mrs. Terri Disharoon in that there was no statutory authority for the expenditure of these amounts which the Court finds was in furtherance of the passage of a bond issue in Claiborne County, Mississippi.
Final Judgment, vol. I, pg. 87. (emphasis added).
While the employment of non-instructional consultants poses no per se legal obstacle, nothing in our statutory or common law authorizes in a public entity's use of public funds to actively campaign for a favored position on a bond issue. A school board, or any public entity, has only those powers expressly provided by statute and those which are vested by necessary implication. Harrison County v. City of Gulfport, 557 So.2d 780, 784 (Miss. 1990); Williams v. State ex. rel. Attorney General, 209 Miss. 251, 266, 46 So.2d 591, 595 (1950); Morris v. Vandiver, 164 Miss. 476, 489, 145 So. 228, 232 (1933). Consequently, the chancellor correctly determined that the Board's expenditure of taxpayer funds *536 for the Disharoon contracts was a blatant and unauthorized expenditure of public funds. It follows that we affirm the lower court's judgment against the board members as such judgment pertains to the Disharoon contracts. For reasons of continuity, we reserve comment on the Board's liability for the Disharoon contracts until part IV of this opinion.

B. THE PURCHASE OF TWO ACTIVITY BUSES

Dr. Jimmy Smith, a former board member for twelve (12) years, described the purchase of two activity buses by the school board. Dr. Smith emphasized that the vehicles are not traditional yellow school buses with bench seats. Both of the buses are blue and white commercial buses that are very similar to Continental Trailways vehicles. The buses are equipped with a restroom, reclining seats, radio, air conditioning and a large amount of storage space. The buses are never used to transport school children between home and the school. Rather, they are used to transport students to activities such as athletic events and field trips. Dr. Smith explained why the buses were purchased.
Well, we felt like we needed the buses. Our kids have participated in events and activities all over the state. We felt like they needed comfort in going and we felt like we had the money to buy them. It would enrich their attitudes and behavior as far as whatever type of competition they were going to be in and... .
Dr. Smith, Record at 257.
The school board approved the purchase for the first bus at its meeting on February 4, 1985. Mr. Jennings, Mr. Knox, Mr. Williams and Dr. Smith voted in favor of the purchase, and Mr. Yarbrough voted against it. The Board paid $170,400.00 for this first bus. The approval for purchase of the second bus came only four months later in May of 1985. Yarbrough and Knox voted against the purchase, and Jennings, Williams and Smith voted in favor. The Board paid $176,254.00 for the second bus. Thus, the two purchases totaled $346,654.00.
Dr. Smith stated that bids were taken on the buses prior to the purchase; however, the Board did not seek approval for the purchases from the State Department of Education. Dr. Smith testified that "regular transportation money" that the district received from the State was not used to purchase the buses. Dr. Smith indicated that the district had used earned interest from "general monies" that the Board had on deposit in high earning certificates of deposit.
Chancellor Zuccaro's opinion makes a specific finding that the purchase of the buses violated Mississippi Code sections 37-41-1, -81, -85, -101. All four of these statutes have been amended since 1985. However, we obviously must look to the language of the law as it existed in February and May of 1985, when the acquisitions were made. This issue requires that we take a step by step approach in examining the purchasing laws which the chancellor concluded that the school board had violated.
First of all, section 37-41-1 grants authority to the State Board of Education to promulgate rules and regulations.
Promulgation of rules and regulations.
The State Board of Education is authorized, empowered and directed to promulgate rules and regulations for:
.....
(c) Setting standards for public school buses;
.....
(i) Formulating specifications for use in purchasing public school buses; getting bids on public school buses; and fixing prices based upon said bids which school districts may not exceed in purchasing said equipment;
1981 Miss.Gen.Laws, H.B. 78, ch. 482, § 2 at 1346. See Miss. Code Ann. § 37-41-1 (Revised 1990).
Section 37-41-81 is the grant of authority to local school districts to purchase transportation equipment.
General grant of authority.
The county boards of education of this state and the boards of trustees of all *537 municipal separate school districts or special municipal separate school districts are hereby authorized and empowered to purchase, own and operate, under such rules and regulations as may be prescribed by the State Board of Education, motor vehicles and other equipment for the transportation of children to and from the public schools of the respective counties and school districts, and to provide for the servicing, repair, care, and maintenance of such county or district-owned motor vehicles and to employ drivers for the operation thereof, and to establish, erect and equip school bus shops or garages, and purchase land therefor, all under such rules and regulations as may be prescribed by the State Board of Education.
1982 Miss.Gen.Laws, S.B. 2364, ch. 354, § 21 at 211. (emphasis added). See Miss. Code Ann. § 37-41-81 (Revised 1990).
The next statute, section 37-41-85, which is not cited or discussed by either party in their briefs, is outcome determinative on the legality of this purchase by the school board. It will be recalled that the Claiborne County Board of Education advertised for bids on the two buses. However, the Board did not seek or receive approval from the State Department of Education before making the purchases.
Purchases to be in manner prescribed by regulations.
No county board of education or board of trustees of a municipal separate school district shall purchase any school bus or pupil transportation service vehicle as authorized by Section 37-41-81 except in the manner prescribed in Section 37-41-101. No school bus shall be purchased or otherwise acquired which does not conform to the specifications provided by the State Board of Education.
1981 Miss.Gen.Laws, H.B. 78, ch. 482, § 3 at 1347. (emphasis added). See Miss. Code Ann. § 37-41-85 (Revised 1990).
The reference in this statute to, "pupil transportation service vehicle," was added by the legislature in the 1981 session; however, even before the 1981 amendment, the statute employed the all-inclusive term, "transportation equipment." See Miss. Code Ann. § 37-41-85 (1972). Either term  pupil transportation service vehicle or transportation equipment  under pre-1981 or post-1981 code law, would certainly include a 48 passenger deluxe commercial vehicle used to transport students. Although this section has been amended twice since 1981, State approval of "pupil transportation service vehicles" is still required by the clear mandate of the statute itself. Thus, State approval for the purchase of the buses was required when the school board spent funds back in 1985, and the law remains unchanged today. See Miss. Code Ann. § 37-41-85 (Revised 1990).
Therefore, we conclude that Claiborne County Board of Trustees was in violation of the law when it purchased both of the buses without State approval. The plaintiffs argue that a "frolic" and "semantic" attempt by the school board to label the vehicles "activity buses" rather than school buses in an attempt to circumvent the statutes simply will not wash. We find that regardless of the label the Board attaches to the vehicles, sections 37-41-1, -81, -85, and -101[1] require State approval before purchase, which the Board did not seek.
The school board argues that since only local revenues were used to purchase the deluxe buses without State assistance, then the purchases were exempted from the purchasing *538 laws. Unfortunately for the school board, only the legislature can carve such an exception into the education transportation purchasing laws, which it has not done at this time.[2] Accordingly, we affirm that portion of the final judgment which found the activity bus purchases to be in a manner unauthorized by law and reserve discussion of the personal liability implications to part III of this opinion.
We note that at the trial of this matter in Claiborne County, Mr. Leonard Cain, Director of the Division of School Buildings and Transportation, Mississippi State Department of Education, testified. Mr. Cain is primarily responsible for the administration and supervision of pupil transportation for the State. Mr. Cain stated that the state contract price for a yellow school bus ranged between $23,800.00 to $30,300.00, depending on the options. He also stated that whenever the State receives an application to purchase an "activity bus," the application is returned to the district because the State does not have the authority to approve an "activity bus." This is an interesting position by the State Department of Education in light of state law which imposes a clear mandate to approve all "pupil transportation service vehicles." See Miss. Code Ann. § 37-41-85 (Revised 1990).

C. A $266,148.00 PERFORMANCE BOND

Thacker Construction Company, a Georgia corporation, had a job training and placement contract with the Claiborne County Board of Education whereby Thacker was to train 200-250 adult students for various trades in the construction industry. The school board paid for the entire cost of the training project.
Near the end of the training program, Thacker was negotiating a construction project with Mt. Calm Senior Hamlet, Inc., as owner, and the United States Department of Housing and Urban Development (HUD) as the mortgagee. This job was for the construction of senior citizen housing in Minden, Louisiana, and Thacker wanted the contract. Before the deal could become final, Thacker was required to post a performance bond or $266,148.00 in escrow to assure HUD and the owner that sufficient funds would be available to complete the project lien free. This prompted Thacker to approach the school board with a proposal. Thacker would hire some of the job training graduates if the school board would agree to place $266,148.00 cash in escrow guaranteeing Thacker's performance on the job in Louisiana. At some point in time near October 1, 1985, the school board agreed to this arrangement, and a deposit in the amount of $266,148.00, evidenced by warrant # 2721, was deposited in the First National Bank of Vicksburg, such funds to be under the control of HUD. Soon after this lawsuit was filed, Mr. Roosevelt Yarbrough, board member and plaintiff, notified the bank that it was holding funds in escrow which were the object of a lawsuit alleging misapplication of public funds. Mr. Yarbrough asked the bank not to release any of the funds without an order of the Chancery Court of Claiborne County. The bank responded positively to Mr. Yarbrough's request and interpled the funds in the United States District Court, Southern District of Mississippi, Western Division. The interpleader action was styled First National Bank of Vicksburg, Mississippi v. HUD, Thacker Construction Co., Mt. Calm Senior Hamlet, Inc., members of the Claiborne County Board of Education and its Superintendent. No. W86-0112(B).
However, the question before this Court is whether or not a school board can post a performance bond for a construction project in an attempt to aid county residents in obtaining employment.
*539 The school board simply references state law which authorizes a school district to introduce music, drawing and manual training into the curriculum as well as vocational training. See Miss. Code Ann. §§ 37-7-301(b), 37-7-625 (1972) (authority to establish vocational training in schools). Vocational education training is now covered in chapter 31 of sections 37-31-1 et seq.
The school board's argument is a simple one. Since the school board can establish vocational training, it certainly should be able to post a performance bond in connection with its job training program. The plaintiffs respond by arguing that there is no statutory authority whatsoever for a school board to post a performance bond for the benefit of a private construction company.
We begin by noting that a school board has only such powers as given by statute or those necessarily implied from those expressly given. Morris v. Vandiver, 164 Miss. 476, 489, 145 So. 228, 232 (1933). Further, there are no other powers. Morris, 164 Miss. at 496, 145 So. at 234. Powers of a school board are not to be extended by construction, and where authority is doubtful, the authority should not be exercised. 78 C.J.S. Schools and School Districts § 99(1) (1952). See Harrison County v. City of Gulfport, 557 So.2d 780, 784 (Miss. 1990) (public body has powers expressly provided and those vested by necessary implication); Williams v. State ex. rel. Attorney General, 209 Miss. 251, 266, 46 So.2d 591, 595 (1950) (Court recognized strict construction of school board's statutory authority); see also Robert W. Anderson House Wrecking and Excavating, Inc., v. Bd. of Trustees, School Dist. No. 25, Fremont County, Wyoming, 681 P.2d 1326, 1330 (Wyo. 1984) ("A public body cannot do indirectly what it is without power to do directly."); Ryan v. Warren Township High School Dist. No. 121, 155 Ill. App.3d 203, 109 Ill.Dec. 843, 844, 510 N.E.2d 911, 912 (1987) (school board has express powers and those necessary to carry into effect those expressly granted); Dieck v. United School Dist., 157 Wis.2d 134, 458 N.W.2d 565, 570 (1990) (school board has express powers and those necessarily implied).
While it is a fact that the Claiborne County School Board had the authority to establish vocational education training, posting $266,148.00 in escrow as a guarantee of payment for a private employer of job training graduates is quite another matter. No reasonable mind could conclude that such a move was an implied power or a necessary incident of the board's express authority to conduct vocational education training. Our laws contain nothing which would suggest that a school board could enter the arena of private employment by bestowing a $266,148.00 advantage to a private employer. The Claiborne County Board was without authority to do this and was in violation of state law when it placed the the funds in escrow. We affirm the chancellor's final judgment which found this to be an illegal expenditure.

D. PAYMENT OF $9427.50 FOR A DOCUMENTARY CONCERNING A SCHOOL
 
BOND REFERENDUM; $944.03 FOR A FISH FRY IN CONNECTION WITH THE 
BOND REFERENDUM; AND THE PAYMENT OF $21,548.92 TO WORKERS IN 
REGARD TO THE BOND REFERENDUM PROMOTION
The school board paid Spectrum Productions $9427.50 for a documentary to educate the public on the bond issue. Dr. Smith stated that the documentary was nonpartisan. "We were advised that we could spend money to educate the community, not to tell them how to vote. We would have been in violation, from what I've been told if we had spent money to try to tell somebody how to vote."
A total of $945.03 was spent for a fish fry and lunch for poll workers on election day.
Attached is a copy of an invoice for payment from Cochran/Sysco Food Services. The items listed on this invoice were purchased for the Bond Referendum Fish Fry and lunch for poll workers.

*540 The total of $945.03 should be charged to the Special Account-Bond Referendum.
Your approval of this request for payment will be appreciated.
Record at Vol. IV, p. 172.
Additionally, the chancellor determined that the school board spent $21,548.92 to pay campaign workers to promote passage of the bond referendum. At a school board meeting on July 3, 1985, the board approved a $25,000.00 advertising budget for the bond referendum. Pages 40-79 of Vol. IV of the record contain the documentation for the salary expenditures. Payment of the funds was designated, "School Related Community Service Work." According to Dr. Smith, the campaign workers and other promotional efforts were in response to distortions in the community generated by Mississippi Power and Light concerning the impact of a bond referendum on the local tax base. This expenditure of salary funds went to campaign workers who canvassed door-to-door for a four month period and worked the polls promoting passage of the bond issue on the day of the election.
After a careful review of the record, we find that no fewer than sixty-five (65) people were on the payroll of the Claiborne County Board of Trustees at various times over the four month period from October of 1984, to January of 1985. The rate of compensation was $4.00 per hour. Campaign workers were paid salaries from a low of $16.00 for one worker to a high of $1600.00 for another who itemized 400 hours of work over a period of sixty-one (61) days. Campaign activities included door-to-door solicitation, answering the telephone, putting up posters and passing out pamphlets.
In Mississippi, a school district is without explicit or implicit statutory authority to expend taxpayer funds in a promotional effort for the passage of a bond referendum. Had the legislature intended to authorize school boards to wage active campaigns for bond issues, a provision in chapter 59 of title 37 would have been the appropriate place to inform the board of this authority. Section 37-59-1 et seq. of the Mississippi Code is devoted to school bonds and obligations. Nothing in this section even hints that a school board can spend public funds to promote passage of a bond issue. Likewise, the statute which empowers local school districts to erect and maintain school facilities falls far short in authorizing a campaign budget of $25,000.00 and lunch for poll workers on the day of the election. See Miss. Code Ann. § 37-7-301(d) (Revised 1990) (authority for school board to construct schools).

III. PERSONAL LIABILITY AND THE RECAPTURE OF EXPENDED FUNDS
The trial court paved the way for the imposition of personal liability for the school board members. In Chancellor Zuccaro's opinion, the court stated that, "the State of Mississippi is entitled to recover of and from the members of the Board of Education of Claiborne County, Mississippi, who voted affirmatively in favor of expenditures hereinafter set forth, to-wit:" The final judgment which followed the written opinion used identical language. Before turning to the personal liability issues raised in this suit, we find that our impetus into this area is substantially assisted by a look at similar experiences in other jurisdictions.
Unquestionably, the most thorough discussion of permissible expenditures by public bodies can be found in a 1953 New Jersey Supreme Court decision by Justice William J. Brennan, Jr. (later United States Supreme Court Justice). Citizens to Protect Public Funds v. Bd. of Education of Parsippany-Troy Hills T.P., 13 N.J. 172, 98 A.2d 673 (1953) (hereinafter cited as Citizens to Protect Public Funds or Citizens).
In Citizens, a school bond referendum was at issue, and the local board of education had authorized an expenditure of funds in the preparation and printing of an eighteen page booklet entitled, "Read the Facts Behind the Parsippany-Troy Hills School Building Program." Citizens to Protect Public Funds v. Bd. of Education, 13 N.J. 172, 98 A.2d 673, 674 (1953). The *541 booklet contained facts regarding the rapid growth of the grade school population, inadequacies of existing facilities, proposed additions, architectural sketches, aggregate and annual costs and the tax impact for the community. Id. 98 A.2d at 674. However, on the cover and on two pages of the booklet there were instructions to, "Vote Yes  December 2, 1952," and a page which listed the negative consequences in the event the referendum failed. "What Will Happen if You Don't Vote Yes?" Id. A local citizens group filed a complaint which challenged, among other things, the legality of the expenditure of public funds by a public body for the advocacy of a favored position. This suit by the citizen taxpayers was spurred, in part, by the absence of any New Jersey statute authorizing an expenditure of public funds in the manner exercised in this case. Id. at 676.
The Court began by noting that fair implication of New Jersey law allowed the board to spend some funds in an informational role, incident to the board's legal duty to build and maintain school facilities. Citizens to Protect Public Funds, 98 A.2d at 676 (citing R.S. 18:7-77.1, N.J.S.A.). "The power so implicit plainly embraces the making of reasonable expenditures for the purpose of giving voters relevant facts to aid them in reaching an informed judgment when voting upon the proposal." Citizens, 98 A.2d at 676. The board could spend public funds to inform the community in a fair presentation of both the good and bad consequences of a proposed bond referendum. Id. at 677. However, Justice Brennan concluded that this board of education had overstepped its legitimate and necessary reach.
But the defendant board was not content simply to present the facts. The exhortation "Vote Yes" is repeated on three pages, and the dire consequences of the failure to do so are over-dramatized on the page reproduced above. In that manner the board made use of public funds to advocate one side only of the controversial question without affording the dissenters the opportunity by means of that financed medium to present their side, and thus imperilled the propriety of the entire expenditure. The public funds entrusted to the board belong equally to the proponents and opponents of the proposition, and the use of public funds to finance not the presentation of facts merely but also arguments to persuade the voters that only one side has merit, gives the dissenters just cause for complaint. The expenditure is then not within the implied power and is not lawful in the absence of express authority from the Legislature.
Citizens to Protect Public Funds, 98 A.2d at 677.
The New Jersey Court emphasized that school board members acting in their official capacity shed no First Amendment rights in their advocacy of policies which are deemed beneficial to the district. Indeed, the effective discharge of an elected official's duty would necessarily include the communication of one's considered judgment of the proposal to the community which he or she serves. Citizens to Protect Public Funds, 98 A.2d at 677. For it is only when public coffers are used to advocate only one side, with no opportunity for dissenters to present their side of the issue, when school boards overstep lawful authority and any implied power. Citizens to Protect Public Funds, 98 A.2d at 678. In a nutshell, the school board can inform, but not persuade.
Other jurisdictions have looked to the New Jersey experience for guidance. In Stanson v. Mott, the California Department of Parks and Recreation spent $5000.00 of public funds to actively promote the passage of a bond referendum for the benefit of state parks. Stanson v. Mott, 17 Cal.3d 206, 551 P.2d 1, 130 Cal. Rptr. 697 (1976). The California Supreme Court adopted the rationale of Citizens to Protect Public Funds, in total, finding that a fundamental notion of a democratic electoral process precludes government from "taking sides" in elections or bestowing an unfair advantage to one of several competing factions. Stanson, 551 P.2d at 9, 130 Cal. Rptr. at 705. The California Court could find nothing in its Public Resources Code which authorized an agency of the *542 state to spend the taxpayer's money in a campaign to promote the passage of a bond issue. Id. at 10, 130 Cal. Rptr. at 706. In Stanson, the Court commented on the fine line between a permissible fair presentation of the facts and improper campaign activity.
Problems may arise, of course, in attempting to distinguish improper `campaign' expenditures from proper `informational' activities. With respect to some activities, the distinction is rather clear; thus, the use of public funds to purchase such items as bumper stickers, posters, advertising `floats,' or television or radio `spots' unquestionably constitutes improper campaign activity (see, e.g., Mines v. Del Valle, supra, 201 Cal. [273] at p. 276, 257 P. 530; Porter v. Tiffany, supra [11 Or. App. 542] 502 P.2d [1385] at p. 1386), as does the dissemination, at public expense, of campaign literature prepared by private proponents or opponents of a ballot measure. (See 51 Ops.Cal.Atty.Gen. 190, 194 (1968); Stern v. Kramarsky, supra, [84 Misc.2d 447], 375 N.Y.S.2d 235.) On the other hand, it is generally accepted that a public agency pursues a proper `informational' role when it simply gives a `fair presentation of the facts' in response to a citizen's request for information (see Citizens to Protect Pub. Funds v. Board of Education, supra, [13 N.J. 172] 98 A.2d 673, 677; Stern v. Kramarsky, supra, 375 N.Y.S.2d 235, 239-40; 51 Ops.Cal.Atty. Gen. 190, 193 (1968).
Stanson, 551 P.2d at 11, 130 Cal. Rptr. at 707.
More recently, a Florida appellate court was faced with a similar question wherein Palm Beach County had authorized $50,000.00 to promote the passage of a local Health Care Act. Palm Beach County v. Hudspeth, 540 So.2d 147 (Fla. 4th Dist.Ct. App. 1989). Finding little guidance in Florida law, the Florida appellate court endorsed the approach taken in Citizens to Protect Public Funds v. Board of Education of Parsippany-Troy Hills TP., 13 N.J. 172, 98 A.2d 673 (1953). The Florida court summarized the cases on point as follows.
The theme which predominates in these cases, and one which is reinforced by logic and common notions of fair play, is simply stated. Why the county not only may but should allocate tax dollars to educate the electorate on the purpose and essential ramifications of referendum items, it must do so fairly and impartially. Expenditures for that purpose may properly be found to be in the public interest. It is never in the public interest, however, to pick up the gauntlet and enter the fray. The funds collected from taxpayers theoretically belong to proponents and opponents of county action alike. To favor one side of any such issue by expending funds obtained from those who do not favor that issue turns government on its head and is the antithesis of the democratic process.
In order to create a special taxing district, government must permit the people to be heard and, in fact, to make the ultimate decision at the ballot box. If government, with its relatively vast financial resources, access to the media and technical know-how, undertakes a campaign to favor or oppose a measure placed on the ballot, then by so doing government undercuts the very fabric which the constitution weaves to prevent government from stifling the voice of the people. An election which takes place in the shadow of omniscient government is a mockery  an exercise in futility  and therefor a sham. The appropriate function of government in connection with an issue placed before the electorate is to enlighten, NOT to proselytize.
Palm Beach County v. Hudspeth, 540 So.2d 147, 154 (Fla. 4th Dist.Ct.App. 1989). See Stern v. Kramarsky, 84 Misc.2d 447, 375 N.Y.S.2d 235, 239 (1975) ("Public funds are trust funds and as such are sacred and are to be used only for the operation of government.").
We find compelling wisdom and sound logic in this line of cases which recognizes a balanced, informational role in educating the local community about referendum proposals. A fair and balanced presentation of the facts would also include relevant *543 information addressing the tax impact as well as proposed community benefits. A line does exist between a fair presentation of the facts in an innocent informational role and a concerted campaign designed to achieve the objectives of the proponents. In the words of the Florida appellate court, the taxpayer's money belongs equally to proponents and opponents, and government can never, "pick up the gauntlet and enter the fray." Palm Beach County v. Hudspeth, 540 So.2d 147, 154 (Fla. 4th Dist.Ct. App. 1989).
Our research reveals that several states are assisted by specific constitutional or state law provisions which address governmental expenditures of public funds for the advocacy of favored positions. For example, in Anderson v. City of Boston, the Supreme Judicial Court found that the Massachusetts Home Rule Amendment prohibited the city from appropriating funds for the purpose of influencing an election on a state referendum, citing M.G.L.A. ch. 55, § 22A. Anderson v. City of Boston, 376 Mass. 178, 380 N.E.2d 628, 633 (Mass. 1978). "The Legislature may decide, as it has, that fairness in the election process is best achieved by a direction that political subdivisions of the State maintain a `hands off' policy." Anderson, 380 N.E.2d at 639.
The constitution of our sister State of Louisiana speaks to the application of public funds in election campaigns.
Section 4. No public funds shall be used to urge any elector to vote for or against any candidate or proposition, or be appropriated to a candidate or political organization. This provision shall not prohibit the use of public funds for dissemination of factual information relative to a proposition appearing on an election ballot.
La. Const. art. XI, § 4.
In Godwin v. East Baton Rouge Parish School Board, the appellants alleged that the school board spent taxpayer funds to promote a tax proposal in violation of the constitutional prohibition. Godwin v. East Baton Rouge Parish School Board, 372 So.2d 1060 (La. 1st Dist.Ct.App. 1979). In light of the express constitutional prohibition, the appellate court concluded that the allegations of the complaint, if true, would subject board members to personal liability upon a showing of malice or bad faith. Godwin, 372 So.2d at 1064. See Burt v. Blumenauer, 299 Or. 55, 699 P.2d 168, 176 (1985) (result governed in part by Oregon election finance laws; Court observed, "government may facilitate the market but not itself enter the bidding."); League of Women Voters of California v. Countywide Criminal Justice Coordination Committee, 203 Cal. App.3d 529, 250 Cal. Rptr. 161 (1988) (Court found no violation of California's Public Resources Code or Political Reform Act; Public resources were used only to formulate and draft proposed initiative, not partisan campaign activities); Ryan v. Warren Township High School Dist. No. 121, 155 Ill. App.3d 203, 109 Ill.Dec. 843, 846, 510 N.E.2d 911, 914 (1987) (Illinois Election Interference Prohibition Act, Ill. Rev. Stat. ch. 46, para. 103 (1985), prohibits use of public funds in partisan political campaigns).
Turning now to the case at bar, the plaintiffs below and appellees here direct the Court's attention to section 37-61-19 and argue that statutory authority exists to impose personal liability on the school board members who voted in favor of the illegal expenditures.
Expenditures shall be limited to budgeted amounts; personal liability for excess.
It shall be the duty of the county boards of education, the county superintendents of education, and the boards of trustees of all school districts, including municipal separate school districts, to limit the expenditure of school funds during the fiscal year to the amounts set forth in the respective school budgets unless such budgets be revised in the manner provided in this chapter. It shall be the duty of the county boards of education, the county superintendents of education, and the boards of trustees of all school districts, including municipal separate school districts, in making or approving contracts for transportation, selecting, approving, contracting with, and fixing the salaries of superintendents, *544 principals, and teachers, and in expending other available school funds or incurring obligations payable therefrom to limit the amount of expenditures to the funds made available for such purposes during the fiscal year, and it shall be unlawful for any contract to be entered into or any obligation incurred or expenditure made in excess of the funds available for such purposes for such fiscal year. Any member of the county board of education, county superintendent of education, trustee of a school district, or other school official, who shall enter into any contract, incur any obligation, or make any expenditure in excess of the amount available for that purpose for the fiscal year shall be personally liable for the amount of such excess; in the event such person has given bond, the sureties on this bond shall likewise be so liable.

Miss. Code Ann. § 37-61-19 (1972) (emphasis added).
The above statute was amended in 1986, but its substantive content was not changed. The amendment shortened the statute and merely cleaned up multiple references to school districts. Miss. Code Ann. § 37-61-19 (Revised 1990). The appellees point to the last sentence of this statute and argue that, considering the expenditures at issue in this case had an illegal purpose-promoting passage of the bond issue  then such illegal action by the board is equivalent to the statute's prohibited conduct of, "incur any obligation, or make any expenditure in excess of the amount available for that purpose... ." § 37-61-19. The taxpayers argue that no amount of money can be available to spend on an illegal purpose. There being no amount of money available, by law, for such expenditures, then personal liability logically follows for the board members who voted in favor of the appropriations.
This Court has only one modern era reported decision which has even mentioned this statute. Unfortunately, this case is not instructive as to this point. The Frazier opinion merely cited the statute and noted that a school board may not vote to spend money not made available to it from state appropriations and local taxes. Frazier v. State by and through Pittman, 504 So.2d 675, 699 (Miss. 1987).
As a "political subdivision," a school board is an agency of the State and has a separate and distinct identity from the city or county in which it is located, even though the board can not levy taxes itself and is solely dependent on the city or county for its local tax revenue. Frazier, 504 So.2d at 699; Harrison County v. City of Gulfport, 557 So.2d 780, 789 (Miss. 1990).
Mississippi has its own history of jurisprudence which has addressed questions of personal liability of public officials in their entrustment of public funds. The seminal case in this state for public official liability is Paxton v. Baum, 59 Miss. 531 (1882). In Paxton, taxpayers brought suit against county supervisors alleging that the supervisors had made forty-seven (47) illegal appropriations. Paxton, 59 Miss. at 531. In Paxton, this Court was interpreting § 1378 of the Code of 1871, which provided that, "the boards of supervisors shall direct the appropriation of the money that may come into the treasury of their respective counties, but shall not appropriate the same to any object not authorized by law." Paxton, 59 Miss. at 536. (emphasis added). By this section in the 1871 Code, members of the Boards of Supervisors were personally liable for funds spent to, "any object not authorized by law." Paxton, 59 Miss. at 536. In Paxton, the question centered on the interpretation of the term, "any object not authorized by law," and the Court provided a thorough explanation.
The objects to which money in the county treasury may be appropriated are designated by law, and it is not legally appropriable to any other purposes. If it is appropriated by the board of supervisors to some other object than is authorized by law, members are liable personally for it, unless they voted against such appropriation. It is for money appropriated to something for which the law does not permit it to be appropriated at all, in any way or under any circumstances, that members are personally liable. It *545 is for a diversion of money from its legitimate objects, and not for appropriation to a proper object, although in an irregular or unauthorized manner, that liability is imposed on members personally. It is what the money is appropriated to, and not how it is applied, that furnishes the test of personal liability for it. `Object' signifies the thing aimed at, the end sought to be accomplished. If this is not the true interpretation of the language mentioned, members of the boards of supervisors would be liable personally for every mistake or error of judgment or of information as to facts whereby money was appropriated even to proper objects, if not appropriated in strict accordance with law as to every circumstance attending it. Either members of the boards of supervisors are personally liable for every appropriation not made in strict conformity to law, or they are not liable except for a diversion of public money from authorized objects and its appropriation to such as are not authorized. The objects to which the boards may appropriate money are designated by law, and may be known to them; and, in all cases of doubt, they may resolve the doubt against the appropriation, and avoid risk of liability; and it may be supposed that for appropriations to objects not authorized by law, it was intended to make members of the boards of supervisors personally liable. But, in view of the well-settled rule of the common law that for errors or mistakes a public officer acting judicially or quasi judicially is not liable, it could not have been the purpose of the legislature to make members of the boards of supervisors personally liable for errors or mistakes as to how to act in matters committed to such boards by law, and as to objects for which an appropriation of money is authorized to be made by them. It is when they disregard the law as to the objects to which it has devoted the public money, and divert it to some object to which the law has not devoted it, that personal liability attaches.

Paxton v. Baum, 59 Miss. 531, 536-37 (1882). (emphasis added).
Upon suggestion of error in Paxton, this Court restated its position as follows.
Manifestly it is impossible, after we pass the point of corruption, to draw any line other than that laid down by us, namely, liability when the subject-matter of the appropriation is beyond the jurisdiction of the board; non-liability where the object is within the jurisdiction, but there has been a mistaken exercise of legal power. Within its limit, every case must depend upon its own facts.
Paxton v. Baum, 59 Miss. 531, 540 (1882) (upon suggestion of error).
In State, Lincoln County v. Green, the complaint was against the county superintendent of education seeking to recover sums of money for alleged irregularities in the conduct of his office. State, Lincoln County v. Green, 111 Miss. 32, 71 So. 171 (1916). In declining to impose personal liability, this Court noted that Green was not guilty of corruption or collusion nor had he personally profited from his mismanagement. Green, 111 Miss. at 34, 71 So. at 172.
It will be borne in mind that the several matters complained of in the instant case were items of business within the jurisdiction of the county superintendent, and the services charged to have been illegally paid for were services inuring to the benefit of the county, and not to Mr. Green... . In view of the fact, therefore, that the work paid for by the superintendent and the several alleged irregularities were within the jurisdiction of his office and no corruption is charged, the bill fails to state a cause of action.
Green, 111 Miss. at 35-36, 71 So. at 172. See Trantham v. Russell, 171 Miss. 481, 489, 158 So. 143, 145 (1934) (no liability where superintendent acted in good faith within scope of authority; no liability for honest errors of judgment).
Barnett v. Lollar involved a challenge by the State Auditor against the county school superintendent to recover money that the superintendent allegedly withdrew from the county school fund without legal authority. Barnett v. Lollar, 197 Miss. 574, 19 So.2d 748 (Miss. 1944). The Barnett *546 Court found the superintendent of education to be a quasi judicial officer since he was responsible for issuing certificates of character. Barnett, 197 Miss. at 579, 19 So.2d at 749. Therefore, although this case is factually inapposite from the case sub judice, the question was whether good faith by the school superintendent would immune him from liability in light of the rationale of Paxton. Barnett, 197 Miss. at 580, 19 So.2d at 749. This Court answered the question in the affirmative and declined to impose personal liability because the facts of the case raised an uncertainty of whether or not the superintendent acted in good faith and honest judgment. Id. at 581, 19 So.2d at 750.
However, there are instances wherein illegal expenditures by public officials will preclude a defensible position of good faith. Such instances were described in State by Cochran v. Eakin, 203 So.2d 587 (Miss. 1967).
We are not to be misunderstood as holding, as respects the expenditure of public funds, that any payment whatever it is, will be without any personal liability on the part of the officer if only the purpose of the payment was somewhere within the general field of his jurisdiction. A payment may be within that general field and yet so clearly and distinctly one which the officer could not lawfully make as to bar him from justification in taking the position that he did it in good faith and honest error.
State by Cochran v. Eakin, 203 So.2d 587, 590 (Miss. 1967) (quoting Barnett v. Lollar, 197 Miss. 574, 581, 19 So.2d 748, 750 (1944)).
In Entrican v. King, the State Auditor filed suit against county supervisors alleging illegal expenditure of public funds which were committed to road maintenance. Entrican v. King, 289 So.2d 913, 914 (Miss. 1974). Several points can be taken from Entrican which are instructive for the case at bar. The Entrican Court readopted the rationale of Paxton, decided almost a hundred years earlier, and reviewed the 1871 Code language interpreted in Paxton which provided for personal liability only in instances where public money is appropriated, "to an object not authorized by law." The Court found that likewise, "[t]his is the rule of the common law," as well. Entrican, 289 So.2d at 916.
Additionally, the distinction was made between penalty and non-penalty situations wherein personal liability of public officials is sought. In a penalty situation, personal liability is sought for the unauthorized or prohibited manner of an expenditure to a lawful object, yet the public itself suffers no loss or deprivation as a consequence of the unauthorized action by the official. Entrican v. King, 289 So.2d 913, 915 (Miss. 1974). In other words, in penalty situations, the taxpayers are questioning the manner or authority of the public body, even though the funds were committed to a lawful object. Furthermore, if liability is sought in penalty situations, there must be clear statutory intent before liability will attach. Entrican, 289 So.2d at 916. Mississippi jurisprudence does not favor a penalty, and statutory construction of a penal statute will be against the penalty unless provided by clear language. Commercial Nat'l Bank v. Fleetwood Homes of Mississippi, 398 So.2d 659, 661 (Miss. 1981). Consequently, non-penalty situations might be said to exist in instances where public funds are committed to unlawful objects leaving the public wrongfully deprived of resources which it should have had available for legitimate, lawful endeavors. In such cases, the rule of the common law prevails which attaches personal liability to money appropriated, "to an object not authorized by law." Entrican v. King, 289 So.2d 913, 915-16 (Miss. 1974) (citing Paxton v. Baum, 59 Miss. 536, 537 (1882)).
In State ex. rel. Summer v. Denton, we held that a board of supervisors was not personally liable for county funds paid to relatives in violation of a nepotism statute where the county did not suffer any actual loss due to the unlawful expenditure. State ex. rel. Summer v. Denton, 382 So.2d 461, 462 (1980). This Court noted in *547 1980, that the principles announced in Paxton had been faithfully followed throughout the years without judicial erosion. Denton, 382 So.2d at 465.
Manifestly it is impossible, after we pass the point of corruption, to draw any line other than that laid down by us, namely, liability when the subject-matter of the appropriation is beyond the jurisdiction of the board; non-liability where the object is within the jurisdiction, but there has been a mistaken exercise of legal power. Within its limit, every case must depend upon its own facts.
State ex. rel. Summer v. Denton, 382 So.2d 461, 465 (1980) (quoting Paxton v. Baum, 59 Miss. at 540). (emphasis added).

IV. APPLICATION OF LAW TO THE FACTS
As the foregoing demonstrates, we bring a perspective of public official liability which has evolved for over one hundred years to the questions of liability which we address today. In applying the law to the facts of this case, we find ourselves drawing upon a wealth of guidance beginning with Paxton v. Baum and its progeny. Furthermore, we view the imposition of personal liability as a sobering consequence for the breach of the public's trust, and for that reason we proceed with utmost caution and demand strict proof in the record before determining that liability attaches.
First, we return to the matter of the Disharoon contracts and make the following observations. The purpose of hiring a husband and wife team for four months of contract work at a cost of $51,725.00 in taxpayer funds was to promote the passage of a bond referendum in Claiborne County. Consequently, this expenditure involves more than a mistaken exercise of authority. The entire objective was unauthorized, and the school children of Claiborne County were wrongfully deprived of the benefit of these funds. See Entrican v. King, 280 So.2d 913, 915-16 (Miss. 1974) (citing Paxton v. Baum, 59 Miss. 536, 537 (1882)). As noted elsewhere in this opinion, a line does exist between an innocent informational role which is permissible and a full-scale campaign designed to achieve the objectives of the proponents. Clearly, the Board's employment of the Disharoons crossed that line. Therefore, as a matter of law, the Disharoon contracts were far beyond the jurisdiction of the board to make.[3]See Paxton v. Baum, 59 Miss. 531, 540 (1882). Paxton bound, it follows then that personal liability attaches for the board members who voted in favor of the Disharoon contracts, an amount totalling $51,725.00.[4]
A school district is empowered with the authority to purchase transportation *548 equipment.[5] The legislature has seen fit to establish procedures which must be followed before purchasing school vehicles to ensure compliance with safety standards and expectations of prudent application of taxpayer resources. The Claiborne County Board of Trustees violated state law by purchasing two deluxe commercial vehicles without State approval. We find this to be a textbook example described in Paxton v. Baum, wherein the object is lawful and within the Board's jurisdiction, i.e., the purchase of transportation equipment, but there has been a mistaken exercise in legal power in that State approval was not sought. Therefore, we decline to impose personal liability. "[N]on-liability where the object is within the jurisdiction, but there has been a mistaken exercise of legal power." Paxton v. Baum, 59 Miss. 536, 540 (1882); State ex. rel. Summer v. Denton, 382 So.2d 461, 465 (1980). Further, the imposition of personal liability wherein the object is lawful, but the manner of acquisition is unauthorized or prohibited, yields what Entrican calls a penalty situation. Entrican v. King, 289 So.2d 913, 915 (Miss. 1974). In penalty situations, there must be clear statutory intent to impose liability before liability attaches. Entrican, 289 So.2d at 914. We do not find the clear intent in our statutory laws which Entrican demands.[6]
By posting a performance bond in the amount of $266,148.00, as guarantor for a private construction company, the Claiborne County Board of Trustees left the arena of education and entered the business of employment placement. Community efforts directed at job placement are admirable, but such efforts are assigned to other State entities. The Claiborne County Board took a roll of the dice with over a quarter of a million dollars of the taxpayers' money by risking it on the solvency of a private company. Such a haphazard application of public funds is not only ill advised, but it is also illegal. This was not a mistaken exercise of legal power. This was an illegal expenditure which far exceeded explicit or any perceived implicit authority. Liability attaches.
Due to the efforts of the plaintiffs' attorneys along with Mr. Roosevelt Yarbrough, plaintiff board member, an interpleader action in federal court was initiated with First National Bank of Vicksburg as plaintiff; HUD et. al. as defendants, and the State of Mississippi, et. al. as intervenors. We take notice of the fact that this suit in federal court has been brought to a conclusion by final judgment entered in favor of the State of Mississippi, intervenor, on May 4, 1990. By way of a certified pay voucher, we find that on July 16, 1990, $344,352.44[7] was returned to the State of Mississippi for the use and benefit of the Claiborne County School District. We need say nothing more than, but for the successful return of these funds to the State of Mississippi, each board member who voted in favor of this appropriation shared a potential personal liability for this expenditure.
*549 We turn now to three expenditures which precipitated the school bond referendum election. The school board paid a production company $9427.50 for a documentary concerning the bond referendum. Dr. Smith stated that the documentary was non-partisan. Finding nothing in the record to contradict this assertion, we accept it at face value. Non-partisan, informative communications to the community fall within the permissible range of legal expenditures. It follows that we find error in the chancellor's ruling which held the documentary expenditure to be an illegal one, and we hereby reverse as to that finding.
However, we have before us a very different animal regarding the $944.03 for a fish fry and $21,548.92 for campaign workers. No fewer than sixty-five (65) people were on the payroll of the Claiborne County Board of Trustees promoting the passage of a school bond referendum. The pay for many of these workers ranged from $500.00 to $1000.00. Promotional efforts consisted of traditional campaign activities such as distributing literature and canvassing door-to-door. In a similar vein, $944.03 was spent on a fish fry to promote the referendum and to provide lunch for poll workers.
Suffice it to say that we find far too much zeal in these efforts to accept that an unbiased, nonpartisan presentation of the facts was the Board's aim. The employment of the campaign workers was not unlike the Disharoon employment except for the rate of compensation; and, once again, the line was crossed. Under our standard of review and insistence upon strict proof in the record as a prerequisite to liability, we find substantial evidence supporting the chancellor's determination that both of these expenditures constituted illegal promotional efforts. Further, we are not impressed with the Board's attempt to mask these payments under the claim of "School Related Community Service Work."
Recognizing that a school board is tasked under state law with the responsibility of constructing schoolhouse facilities,[8] an implicit incident to this obligation could include reasonable, non-partisan expenditures designed to give the community relevant information to aid in making an informed decision at the polls. Citizens to Protect Public Funds v. Board of Education, 13 N.J. 172, 98 A.2d 673 (1953). We find nothing reasonable in sixty-five (65) campaign workers and a fish fry. Both expenditures were to unlawful objects, an appropriation beyond the jurisdiction of the board. Together, the two expenditures total $22,492.95, the use of which the Claiborne County taxpayers were wrongfully deprived and should have had available for legitimate, lawful objects.
Upon close examination of the record, we conclude that these sums were paid from a $25,000.00 advertising budget approved by the board on July 3, 1985. Accordingly, we hold all members of the Claiborne County Board of Trustees who voted affirmatively for a $25,000.00 advertising budget on July 3, 1985, personally liable for illegal expenditures of $944.03 for a fish fry and $21,548.92 for campaign worker salaries.

V. ATTORNEYS' FEES/EXPERT'S FEE AND PUNITIVE DAMAGES
Tideway Oil is the seminal case governing the award of punitive damages in chancery court. Tideway Oil Programs Inc. v. Serio, 431 So.2d 454 (Miss. 1983). Tideway Oil instructs that punitive damages are recoverable where the defendant has done to the plaintiff such a wrong as to import "insult, fraud, oppression or reckless disregard for the rights of the plaintiff." Tideway Oil, 431 So.2d at 465. "Such damages ought to be awarded only where the plaintiff, at great trouble and personal expense, has rendered a public service by bringing the wrongdoer to account." Id. at 461. The rationale of Tideway Oil has been applied consistently in our case law and is now frequently cited with approval. See Southeast Bank of Broward, Florida v. I.P. Sarullo Enterprises, Inc., 555 So.2d 704, 712 (Miss. 1989) (Tideway Oil lists circumstances under which punitive damages *550 can be awarded); Central Bank of Mississippi v. Butler, 517 So.2d 507, 512 (Miss. 1987) (punitives are assessed in extreme cases).
Additionally, this Court has analogized an allowance of attorneys' fees to the grant of punitive damages. Absent statutory authority or contractual provisions, attorneys' fees cannot be awarded unless punitive damages are also proper. Defenbaugh and Company of Leland v. Rogers, 543 So.2d 1164, 1167 (Miss. 1989); Central Bank of Mississippi v. Butler, 517 So.2d 507, 512 (Miss. 1988); Grisham v. Hinton, 490 So.2d 1201, 1205 (Miss. 1986); Gardner v. Jones, 464 So.2d 1144, 1150 (Miss. 1985); Aetna Casualty & Surety Co. v. Steele, 373 So.2d 797, 801 (Miss. 1979). Within these guidelines, the allowance and the amount of a fee is a matter committed to the sound discretion of the trial judge. Young v. Huron Smith Oil Co., Inc., 564 So.2d 36, 40 (1990); Carter v. Clegg, 557 So.2d 1187, 1192 (Miss. 1990).
The chancellor found that the illegal expenditures were so blatant and extreme that punitive damages and attorneys' fees should be granted. Since there was no testimony of the defendants' net worth, the chancellor granted $1.00 in punitive damages. The final judgment by Chancellor Jenkins allowed punitive damages of $1.00 and a fee of $25,638.00 for two attorneys employed by the plaintiffs. An expert's fee in the amount of $5000.00 for the plaintiffs' accountant was also allowed. We find no abuse of discretion in the chancery court's allowance of all fees in this case. We consider this case to be the classic public interest lawsuit, where the plaintiffs at great trouble and expense have rendered an invaluable public service by bringing the wrongdoers to account. See Tideway Oil Programs, Inc. v. Serio, 431 So.2d 454, 461 (Miss. 1983).
Further, we note from the record that subsequent to the trial of this case, a hearing was conducted on the petition of plaintiffs' attorneys for an allowance of fees. The court heard oral and documentary evidence in support of the motion and allowed attorneys' fees and an expert's fee to the plaintiffs' accountant. The order allowing fees makes specific findings relative to the novelty and difficulty of the case, requisite skill in performing the proper legal services, preclusion of other employment while engaged in this case, etc. This is the correct approach which trial courts are to take in ascertaining fair and reasonable fees as described in McKee v. McKee, 418 So.2d 764, 767 (Miss. 1982). See Carter v. Clegg, 557 So.2d 1187 (Miss. 1990).

VI. CONCLUSION
Regarding the final judgment entered by the Claiborne County Chancery Court in this case on December 3, 1987, we find as follows.
We affirm as to the Disharoon contracts finding that the contracts were unlawful and unenforceable. Personal liability attaches for all members of the Claiborne County Board of Trustees who voted to affirm the Board's contracts with State Senator James Disharoon and his wife, Mrs. Terri Disharoon.
We affirm as to the purchase of two activity buses finding such purchases to have been made in a prohibited and unauthorized manner under state law. For the reasons stated in this opinion, we do not impose personal liability.
We affirm as to the chancellor's determination that the Claiborne County Board of Trustees authorized an illegal appropriation by posting a $266,148.00 performance bond for the benefit of a private construction company. However, given the successful conclusion of the intervenor action in United States District Court, the personal liability aspect of this expenditure is now moot.
We reverse as to that portion of the final judgment which held a $9427.50 expenditure for a documentary to be an illegal appropriation finding no evidence in the record that the documentary was, in fact, partisan in its communication to the community.
We affirm the final judgment holding that $944.03 spent for a fish fry and $21,548.92 for campaign worker salaries were *551 illegal expenditures and impose personal liability as a consequence thereof for the reasons stated in this opinion.
We affirm the chancellor's allowance of an expert's fee, attorneys' fees and punitive damages of $1.00.
AFFIRMED IN PART AND REVERSED IN PART.
ROY NOBLE LEE, C.J., HAWKINS, P.J., and PRATHER and ROBERTSON, JJ., concur.
HAWKINS, P.J., specially concurs by separate written opinion, joined by DAN M. LEE, P.J., and PRATHER and ROBERTSON, JJ.
PRATHER, J., specially concurs by separate written opinion.
McRAE, J., dissents as to part II.A. by separate written opinion, joined by SULLIVAN, J.
PITTMAN and BANKS, JJ., not participating.
HAWKINS, Presiding Justice, concurring:
I concur in the majority opinion and write separately to address the Disharoon contracts in the context of Article IV, Section 109 and hold that they did not constitute violations of that section.
The chancellor found the Disharoon contracts a blatantly unauthorized expenditure of public funds, and I would affirm on this basis, as does the majority opinion, for that purely and simple is what they were.
I can and do applaud the lofty motives of the dissent in taking umbrage at double dipping, but disagree with the dissent that the Disharoon contracts violated § 109.
In Frazier v. State, by and through Pittman, 504 So.2d 675 (Miss. 1987), there were four individuals involved, namely: Hillman T. Frazier and Douglas Anderson, professors at Jackson State University, and James D. Nunnally and his wife Mrs. Nunnally, who were employed as teachers in the public schools of Benton County and Tippah County, respectively. Our state institutions of higher learning are almost totally financed by state appropriations. A major portion of the Nunnallys' salaries as public school teachers came from legislative appropriations.
On April 17, 1984, Representative Frazier and Senator Anderson voted on Senate Bill 2985, which became Chapter 209, Laws 1984, an appropriation bill which furnished the funds for Jackson State University, from which their salaries were paid.
On February 28, 1985, Representative Nunnally voted on House Bill 1172, which became Chapter 95, Laws 1985, an appropriation bill which furnished the funds for a major portion of his and Mrs. Nunnally's salaries as public school teachers. In addition, Representative Nunnally was a member of the legislature in 1985 when Senate Bill 2876, which became Chapter 351, Laws 1985, setting public school teachers' salaries was passed.
Quoting from Frazier, 504 So.2d at 693:
SECTION 109
Miss. Const. Art. IV, § 109 reads:
No public officer or member of the legislature shall be interested, directly or indirectly, in any contract with the state, or any district, county, city or town thereof, authorized by any law passed or order made by an board of which he may be or may have been a member, during the term for which he shall have been chosen, or within one year after the expiration of such term.
This section prohibits any public officer or member of the legislature from:
(a) having any direct or indirect interest in any contract
(b) with the state or any political subdivision
(c) executed during his term of office or one year thereafter, and
(d) authorized by any law, or order of any board of which he was a member.
We held further:
These appropriation bills were laws. Cassibry v. State, 404 So.2d 1360, 1366 (Miss. 1981). They were laws passed while these gentlemen served in the legislature. Their contracts were made *552 while they were in the Legislature. Thus, they squarely fit § 109.
504 So.2d at 696.
Finally, as to the particular contracts under which Representative Frazier and Senator Anderson were employed, we noted: "The governmental bodies contracting with these defendants could not have made payment under the contracts without these appropriations." 504 So.2d at 696.
And, as to Representative and Mrs. Nunnally, we noted that a "major portion" of their "compensation is paid by the state rather than the local school district." 504 So.2d at 697.
What is at stake under § 109 is the contract which the legislator has with the local subdivision, and only if that particular contract is financed by state funds is § 109 implicated.
We did not at any place in Frazier hold that simply because a county, municipality or school district receives state funds it is prohibited from hiring a legislator. Rather, it was whether or not the contract with employee/legislator was financed in whole or substantial part by state funds which furnished the criterion.
It takes a leap beyond the language of § 109 to hold that if any political subdivision of this state receives an appropriation of state funds, it cannot hire or contract in any way with a member of the legislature, even though all of the funds from which he is compensated are derived from local taxation or a source completely separate from any state appropriation.
Also, in Frazier we held that § 109 did not apply to a legislator's wife who taught in the public schools, even though it applied to her school teacher husband. 504 So.2d at 697-98, thus giving stronger reason why § 109 does not apply to Mrs. Disharoon.
In Frazier this Court followed the literal language of § 109.
The only question in this case is whether § 109, simply because of an appropriation of public funds to the political subdivision, prohibits the Disharoon contracts, even though none of the appropriated funds are paid to them. Only by distorting the language of § 109 could we hold this. A legislative appropriation to political subdivisions is not a contract with them.
In my lifetime John C. Stennis, James O. Eastland and J.P. Coleman each served at one time or another in the Legislature. All came from small counties. In all likelihood each of them during his tenure as legislator also did legal work for his local school board, municipality, or board of supervisors. Of my personal knowledge, I know that for many of the years in which he served the Legislature, Walter Sillers was also attorney for the board of supervisors of Bolivar County. It is difficult for me to conceive that these giants of both the legal profession and in public service did not accurately grasp § 109's meaning.
DAN M. LEE, P.J., and PRATHER and ROBERTSON, JJ., join this opinion.
PRATHER, Justice, specially concurring:

I.
I write separately on the question of the Disharoon contracts to specially concur with the majority view. I agree with the majority that the Disharoon contract was an unauthorized expenditure of public funds.
However, the concurring opinion of Justice Hawkins expresses his view on section 109, and in this regard, I express my view on that issue also to re-affirm my view expressed in Smith v. Dorsey, 530 So.2d 5, 12 (Miss. 1988) (Prather, J., Concurring). When this case was first before the Court on issues other than today's, I wrote a separate opinion and explained that:
I would apply the language of Frazier, supra, on a common sense practical interpretation and adopt a remote/insubstantial standard for deciding whether a school board member is interested in his spouse's contract when discretionary judgments are exercised.
Smith v. Dorsey, 530 So.2d 5, 12 (Miss. 1988) (Prather, J., concurring). Then I followed Frazier where Justice Hawkins wrote:

*553 If only a small portion of ... [the legislator/public school teacher's] salary, as opposed to virtually all, came from the appropriation bill, he might have an argument. For here again it would insult the common sense of the 1890 Constitutional Convention that they intended any interpretation of § 109 to trickle down to triviality.
Frazier, 504 So.2d at 697. I believe much of this, and of what I said in Smith I, has application and force today when we are considering whether former State Senator Jay Disharoon has violated Section 109 by his and his wife's consulting contracts with the school board.
In a technical sense, it is true that former Senator Disharoon had an "interest" in his contract with the school board in that he signed the contract, and the school board paid him $34,725.00. The question, however, is whether that interest
is such that a reasonable person would believe that it could influence the official's judgment.
Smith I, 530 So.2d at 12. To answer this question, we need to be clear what Disharoon's position was and what sort of official judgment he was called upon to exercise. In point of fact, Disharoon was a member of the Legislature that appropriated monies to fund the Minimum Foundation Educational Program. See Miss. Code Ann. § 37-9-1 et seq. (1972). Indisputably, however, Disharoon's fees under the consulting contract were paid with local monies, and so the question becomes whether the prospect of entering a consulting contract to be paid with local monies could be reasonably likely to influence Senator Disharoon's official judgment when it came time to vote on the Minimum Foundation appropriation. We must keep in mind that Section 109 prohibits legislators voting for their selfinterest and insures that legislators are influenced only by their sense of public responsibility and the certain knowledge that they are accountable at the polls. Section 109 was never intended to reach arrangements legislators may make unless there is a substantial likelihood those might tempt the legislator to vote his or her selfish interest and not the public interest.
In Smith I, I urged that this Court adopt the position that it would not find Section 109 violation when a school board member's interest in a contract was remote and insubstantial. Opinion Of The Justices No. 317, 474 So.2d 700 (Ala. 1985). I would adopt a like view with respect to a legislator's judgment regarding an appropriations bill. Where the chances are "remote or insubstantial" and
where any potential benefit which the official may receive is far removed, or unlikely to occur, or dependent upon the decision of an independent third party so that the possibility of the benefit cannot reasonably be believed to influence his judgment,
Smith I, 530 So.2d at 13, if this Court should find a section 109 violation.
In sum, failing to prevail in this view, today I join Presiding Justices ARMIS HAWKINS' and DAN M. LEE's views.
McRAE, Justice, concurring in part and dissenting as to part II(A):
While I agree that the Disharoon contracts constituted an unauthorized expenditure of public funds, I disagree with the majority's reasoning in affirming the Chancellor's findings, concluding instead that the contracts violated article IV, section 109 of the Mississippi Constitution. The majority, however, finds that the contracts were a blatant violation and an unauthorized expenditure and affirmed punitive damages. What does "unauthorized" mean? As noted in the body of this opinion, "nothing in our statutory or common law finds approval in a public entity's use of public funds to actively campaign for a favored position." This is in keeping with the standards set by Citizens to Protect Public Funds v. Bd. of Education of Parsippany-Troy Hills, T.P., 13 N.J. 172, 98 A.2d 673, 678 (1953) and its progeny, wherein it has been held that a school board can use public funds to inform the community, but not to persuade it to vote for or against an issue. However, the contracts entered into between the Senator Disharoon and his wife with the School *554 Board did not specify that the two were hired to function in a partisan role, nor does the evidence in the record indicate that they did so. Rather, they were hired to provide counsel, aid, and assistance to the School Board in the development and improvement of its educational programs and facilities. Granted, they were also expected to further the best interests of the Claiborne County Public School District, but provisions of the contract, such as that which defined their role to include the preparation of public forums and debates, facially imply that the School Board, in hiring the Disharoons, sought their expertise to assist in educating and informing the public, thus providing a forum for both dissenters and advocates of an improved school system. The majority, on a related issue, found that the $9,427.50 which the Board paid for a documentary film produced to educate the public on the bond referendum, was within the realm of authorized expenditures. In reversing the Chancellor's decision, the majority observed that:
Dr. Smith stated that the documentary was non-partisan. Finding nothing in the record to contradict this assertion, we accept it at face value. Non-partisan, informative communication to the community falls within the permissible range of legal expenditures.
How can the majority, without any evidence, say on one hand that the $9,427.50 expenditure is all right because it is non-partisan and informative, and on the other hand say that Senator Disharoon and his wife's contracts are partisan and therefore illegal? The only thing that makes Senator Disharoon's contract illegal is article IV, section 109 of the Mississippi Constitution.
By the same token, despite any assumptions made by the majority, the four corners of the record before us do not indicate that the Disharoons contracted to embark on a wholly partisan project. The testimony of Dr. Jimmy Smith, Board Chairman, indicates clearly that the contracts were made with the Disharoons to provide consultation and community information services. Dr. Smith indicated as well that he believed the contracts to be legal and in fact, voted for their approval. On direct examination, Smith responded as follows:
Q. It is not true that Senator Disharoon, James Disharoon, and his wife, Terrie Disharoon, were retained by the Board of Education of Claiborne County in connection with the bond referendum?
A. No, it is not true.
He further testified with regard to Senator Disharoon's contract with the Board.
Q. Was Mr. Disharoon ever employed by the Claiborne County Board of Education?
A. Yes, he was.
Q. And for what purpose and under what circumstances?
A. One, he was to look at some of the legal problems we had. We were very concerned that we were one of the few districts in the state who had never won a reduction in force case. We were also 
THE COURT: Had never done what?
A. We were one of the few, if not the only district in the state who had never won a reduction in force case; it is a lawsuit. We also needed his expertise in dealing with new and existing laws that went into legislature as a Senator, which we didn't pay for that, but we were also educating our community to various things and we hired him as a consultant which would  and we made sure that we didn't come in contact, conflict with his duties and responsibilities as a State Senator nor in conflict with any duties and responsibilities that he would have toward his constituents.
It would seem, however, that it was Senator Disharoon's contacts with the legislature that made his services so valuable to the Board. Minutes of a Special Meeting of the Claiborne County School Board, dated September 30, 1985, reflect the following:
DISCUSSION WITH SENATOR JAY DISHAROON
Senator Disharoon gave an update on the bond referendum. After Senator Disharoon met with several legislators, it was found that plans are under way to *555 introduce a lieu [sic] tax plan which will exempt Middle South Utilities from paying county taxes. Also, a statute would only allow a bond issue to be passed for five million dollars.
Dr. Smith testified further regarding the Board's employment of Senator Disharoon's wife:
Q. And who is Terrie Disharoon?
A. Terrie Disharoon happens to be Jay Disharoon's wife.
Q. Was she also employed by the Claiborne County School System?
A. Yes, she was employed in the, as a consultant to deal with public relations.
* * * * * *
Q. And she was employed in the area of public relations did you say?
A. That is correct.
Q. Do you know of Mrs. Disharoon's background?
A. I know she had worked for a former Senator or a Governor in the area of public relations. We hired her because she had done some things for us and we felt like she would be an asset to our staff as a consultant at that point.
Dr. Smith discussed the Board's interest in hiring Mrs. Disharoon:
She had previously worked in public relations and we felt like she would be an asset to our staff and at the same time in educating people. There were rumors in the white community and the black community and we were of the opinion that she could bridge the gap whereas many whites in our county would not be receptive to listen to Jimmy Smith in his attempt to educate them as to the particulars of the bond issue, they would possibly listen to Terrie Disharoon based on the inferiority complex.
He further testified that he had voted to authorize those expenditures at the September 12, 1985 meeting.
Q. Now, you are not disputing the fact that the payments, the amounts I gave, are you?
A. No.
Q. All right, sir.
A. And I voted for them.
Dr. John C. Noble, Claiborne County Superintendent of Education likewise testified that:
Q. And you are familiar with the fact that the Claiborne County Board of Education retained the services of Senator James Disharoon, are you not?
A. Yes.
Q. And as the evidence shows that that was a period from September 9 of 1985 until December 31, 1985. What was the purposes of that employment?
A. I'm not certain. If my memory serves me correctly some type of legal work he was suppose [sic] to do, contract or 
Q. Was it in connection with the bond referendum?
A. It could very well have been. I think it was during that time, yeah.
* * * * * *
Q. For $54,000.00 paid by the Claiborne County Board of Education what did Mr. and Mrs. Disharoon do for the School Board? That is my question.
A. Counselor, I cannot quote to you and I won't answer in regard to that amount because I don't recall what the amount of money 
THE COURT: Just ignore the amount. Just the question is what did they do. It is not material what they  there is other evidence about that.
A. I don't recall. There were a number of things that were outlined in the contract and if you say it is there for evidence let me see it and it might do something for my memory.
The majority has played loose with the facts to try to "fit" them in with their conclusion. With nothing to contradict the testimony of the Board Chairman, the Superintendent of Education, the Minutes of the Board, or any other witness, I fail to see how the Chancellor could have found Senator Disharoon and his wife's contracts to be a "blatant and unauthorized expenditure" without finding a violation of article IV, section 109. It is only under the "conflict of interest" provision of our Constitution, *556 with its express prohibition against "double dipping" by public officials, that Senator Disharoon's contract enters the realm of illegality. After a careful review of the evidence which the majority relies on to show that Senator Disharoon and his wife's contracts were a blatant violation and affirmed the assessment of punitive damages, it is noted that very few facts are actually cited. Why? Why doesn't the majority tell what is so blatant and so illegal?
In Frazier v. State, by and through Pittman, 504 So.2d 675 (Miss. 1987), we attempted to set forth parameters within which public officials and their spouses could contract with a public school system without running afoul of section 109. Strictly interpreting section 109, we held that a member of the Legislature, sitting during a session where minimum salaries were set for teachers, could not also collect his teaching salary, which was paid for largely by state appropriations, rather than local funds. Id. at 697.
Presiding Justice Hawkins stated in Frazier:
The governmental bodies contracting with these defendants could not have made payment under the contracts without these appropriations. These appropriation bills were laws. Cassibry, 404 So.2d 1360, 1366 (Miss. 1981). They were laws passed while these gentlemen served in the Legislature. Their contracts were made while they were in the Legislature. Thus, they squarely fit the prohibition of § 109.
* * * * * *
Nunnally argues in addition that the appropriation bills authorizing his contract were "general" appropriation bills and not "specific" like the appropriation in Cassibry. While it is correct that in Cassibry we did not address whether a general appropriation bill should be treated differently from other appropriation bills of the Legislature, and there is some support for Nunnally's contention in State, ex rel. Baca v. Otero, 33 N.M. 310, 267 P. 68 (1928), we cannot see such a distinction between House Bill No. 1172 (Chapter 165, Mississippi Laws 1984), which appropriated the funds necessary for a major portion of Nunnally's salary, and Senate Bill No. 2985 (Chapter 209, Mississippi Laws 1984), which appropriated the funds necessary for Anderson's and Frazier's salaries, as to require a different holding under 109 in his case. Frazier and Anderson make no claim that their appropriation was general, as indeed it was not.
504 So.2d at 696.
The Frazier Court further quoted from the Oklahoma Supreme Court, which state had a similar prohibition:
The Oklahoma Supreme Court noted that the above-quoted clause of its constitution had never been directly construed by that court, "if indeed construction is necessary." [Settles v. Board of Education,] 389 P.2d [356] at 359. That court held Settles was in violation of its state's constitution.
The Oklahoma Supreme Court held, as we have held, that the appropriation bill was necessary to make Settles' school contract legal and binding, and therefore his school contract violated the state constitution. See generally Norbeck & Nicholson Co. v. State, 32 S.D. 189, 142 N.W. 847 (1913); Lillard v. Freestone County, 23 Tex.Civ.App. 363, 57 S.W. 338 (1900).
504 So.2d at 697.
The Frazier Court agreed with the holdings of the Oklahoma Court and stated:
Unfortunately for Nunnally, § 109 makes no exception for members of a large class. We must give weight to the words of § 109, and this is precisely how the Oklahoma Supreme Court interpreted that state's virtually identical constitutional provision involving a general appropriation bill.
We must agree that it is relentlessly severe to conclude § 109 means no employed public school teacher can serve in the Legislature. Yet § 109 is just as plain in its restriction as the Oklahoma constitution. We cannot hold that applying § 109 to employed public school *557 teachers goes beyond any rational purpose or intent of its authors.
504 So.2d at 697.
Also in Frazier, looking at the posture of School Board members who taught in the public schools, we drew a line between those contracts which were funded by discretionary local tax levies, which was a violation of section 109, as opposed to those which were funded under a statutory mandate. Id. at 700-701. Further complicating our interpretation of section 109, we held in Smith v. Dorsey I, 530 So.2d 5, 9 (Miss. 1988), that the wife of a School Board member could not teach in the public school system.
I would hold as we have in State, ex rel. Stirling v. Board of Levee Commissioners, 96 Miss. 677, 51 So. 211 (1910), the facts reveal that D.A. Scott, an attorney at law, was a member and president of the Board of Levee Commissioners of the Yazoo-Mississippi Delta. The levee board had an elected attorney who handled all legal matters involving the board. However, after several damage suits were filed against the board, it was decided that additional counsel would be needed to help defend the suits. Mr. Scott, who did not seek employment with the levee board, retired from the board while the suits were pending. Following retirement from the board, Scott was hired as additional counsel to assist with the suits. As a board member, Scott did not seek the employment and took no part in the decision to hire additional counsel. The contract was made in good faith, the services were of value to the board, and the rate of compensation was reasonable. The sole question in the Stirling case was whether or not the contract between Mr. Scott and the board was legal under article IV, section 109 of the Mississippi Constitution of 1890. The Stirling Court found that the Board of Levee Commissioners was an agency created by the State for administering the affairs of the levee district. Its members were public officers. As a result, Mr. Scott, being a former member, was clearly prohibited from entering into a contract by article IV, section 109 of the constitution of 1890. Stirling, 96 Miss. at 685, 51 So. at 211.
Likewise, State Senator Disharoon, regardless of whether he acted in good faith and provided a valuable service at a reasonable compensation, was a member of the legislature who had a purported contract of employment with the Claiborne County School District, a subdivision of the State. Funds for the contracts came from local revenues. Thus, the purported contract entered into between Claiborne County and Senator Disharoon and his wife was clearly prohibited under article IV, section 109 of the Miss. Const. of 1890.
Under Frazier, the contract with Senator Disharoon would have been clearly illegal if it had been paid for instead by state funds appropriated by the legislature during his term. Why should the Disharoon contract be distinguished because it was paid for by local funds? Local tax revenues, like federal tax dollars, are no less public funds than state monies. To split hairs between local and state funds is ludicrous. The legislature, with the powers vested in it by our constitution, holds the supreme taxing authority in this state. Absent a directive from the legislature, local governmental entities are without power to either raise revenues or disburse funds. Especially in light of our modern scheme of school financing, which is built upon an interdependent partnership of federal, state and local funding, as well as matching grants, a public official's influence can be exercised over sources of funding well beyond those tax dollars he directly votes to appropriate. Furthermore, if it is illegal for a legislator to enter into a contract financed by state funds but not local revenues, we are simply inviting local governing boards to manipulate their financing strategies so as to circumvent the strictures of section 109.
The plain language of our constitution does not provide any such artificial limitations on its prohibitions. Article IV, section 109 simply states:
No public officer or official or member of the legislature shall be interested, directly or indirectly, in any contract with the state, or any district, county, city or town thereof, authorized by any law passed or order made by any board of which he *558 may be or may have been a member, during the term for which he shall have been chosen, or within one year after the expiration of such term.
We are reminded of Genesis 2:17, wherein Eve presented Adam with an apple from the "Tree of the Knowledge of Good and Evil." The lesson learned was "Thou shalt not partake" means "do not partake." There was no limiting language; one bite of the forbidden fruit was no less a sin than was devouring the entire apple. Likewise, section 109 does not limit its prohibition to those contracts funded by state monies.
Lay people who have never held public office understand well the meaning of article IV, section 109 of our Constitution. Intelligent officeholders, however, once tantalized by the salivant taste of additional income from still another public source, suddenly realize its impact on their future livelihood. Even those seemingly intelligent individuals trained in the law appear baffled by the simple meaning of the clause. In often well-meaning efforts to find that "it doesn't apply to me or my friends," they seek to obfuscate the intent of our forefathers to provide for an impartial dissemination of public funds, by reconstruing and re-interpreting its applicability. Countless pages of our judicial decisions attempt to explain section 109. The private citizenry of our State, however, encounter no such confusion. They clearly understand and respect its prohibition against "double-dipping," having twice in recent years soundly defeated constitutional amendments which would have diluted its impact.
At the time our constitution was drafted, our forefathers anticipated the perpetuation of a government served largely by part-time public officials. Our legislators, schools board members, and a full panoply of other officeholders, from the lieutenant governor on down augment their public service with private livelihoods. The often-meager income derived from public service was not intended to provide full support for these individuals, but rather to compensate them for the time spent away from their families, homes, and principle sources of income.
We recognize it is our duty to make final interpretation of the language of our constitution. State, ex rel. Moore v. Molpus, 578 So.2d 624, 637 (Miss. 1991). Section 109 means what it says and needs no interpretation. The framers of the constitution, by the plain language of section 109, provided that public service would not become self service by limiting public office to only those people who have no personal interest in any contract authorized by the body to which they belong. It would be folly to assume that the authors of section 109 were not acutely aware that this choice would prevent many excellent people from holding public office; however, they concluded that the danger of the possible abuse of public trust and money was more to be feared than the necessary loss of potential outstanding public servants. However, our growing volume of section 109 jurisprudence, as well as our efforts to skirt around it, serves only to confuse the plain meaning of our constitution, providing potential traps for the unwary, but well-intentioned public official, while at the same time offering easy escape routes for the less than scrupulous.
The majority opinion leaves our public officeholders in a quandary. What constitutes an "unauthorized expenditure" and what doesn't? We have said subjectively, absent a showing that the burden of proof was met, that the contract with Senator Disharoon and his wife was an unauthorized expenditure. Had the majority concluded instead that the Disharoon contracts were a violation of article IV, section 109, public officeholders would have a clear line of demarcation between what they should do and what they should not do. Unfortunately, the majority opinion invites yet another interpretation for another day when some other officeholder will have his hand slapped because we have not done today what should have been done. I, therefore, dissent from this portion of the majority's holding.
SULLIVAN, J., joins this opinion.
NOTES
[1] Section 37-41-101 describes the procedural steps that must be followed when a school district purchases a school bus. First, the State Board of Education advertises and receives bids from approved manufacturers and suppliers. The State Board determines the lowest and best bid, and all approved suppliers can sell provided they do not charge more than the lowest and best bid. Only suppliers who have submitted a bid for the State Department of Education to consider are permitted to sell a school bus as a complete unit. 1981 Miss.Gen.Laws, H.B. 78, ch. 482, § 1 at 1344. The local school district is not required to seek additional advertisements for bids when it makes a purchase, provided that the district does not pay a price that exceeds the maximum allowed as established by the State Department of Education. 1981 Miss. Gen.Laws, H.B. 78, ch. 482, § 1 at 1344. These procedures are unchanged and are described in the present code. See Miss. Code Ann. § 37-41-101(1), (2) (Revised 1990).
[2] State law governing the transportation of school children empowers local districts to expend local revenues, "for the purpose of supplementing funds available to the school board for paying transportation costs, not covered by the minimum education program funds." Miss. Code Ann. § 37-41-7 (Revised 1990). We find no suggestion in § 37-41-7, or elsewhere, that the utilization of local revenues exempts school boards from following purchasing laws and regulations.
[3] In Smith v. Dorsey I, 530 So.2d 5 (Miss. 1988), we held that a school board could not enter into a teaching contract with the spouse of a board member since such contract would violate art. IV, section 109 of the constitution. We declined to require the spouses of the defendants, who were school teachers, to make restitution for salary funds they had received over a period of several years. "There is no way the parties can be put back in their original position before the teaching contracts were entered. For restitution to be equitable, there would have to be some way of restoring to the teachers the value of the services they have rendered to the schools. Obviously, this cannot be done." Smith v. Dorsey I, 530 So.2d 5, 8 (Miss. 1988). Some of the school teachers had served in that capacity for several years, and this Court recognized the impracticable and harsh result that a restitution order would have. "The equitable remedy of restitution should not be enforced in such an inequitable way." Smith I, 530 So.2d at 9.

This second half of Smith v. Dorsey is very different in two regards. First of all, the impracticable and inequitable considerations in Smith v. Dorsey I, are not even present in this second half of the case which concerns two, four month contracts with "non-instructional personnel." Second, we do not address a question of restitution by school district employees who are non-parties, as was the situation in Smith v. Dorsey I, 530 So.2d 5 (Miss. 1988). Here we address the personal liability of the defendant school board members who entered into an illegal contract, not an equitable principle of restitution for non-party beneficiaries of a constitutionally prohibited contract.
[4] Upon close review of pages 21-24 of the record, vol. IV, we find that the board members who voted to approve the Disharoon contracts at its September 12, 1985, meeting included Dr. Jimmy Smith, Mr. Bennie Knox, and Mr. Calvin Williams.
[5] See Miss. Code Ann. § 37-41-81 (Revised 1990).
[6] As noted, the appellee taxpayers direct the Court's attention to § 37-61-19 which states the following. "Any member of the county board of education ... who shall enter into any contract, incur any obligation, or make any expenditure in excess of the amount available for that purpose for the fiscal year shall be personally liable for the amount of such excess... ." Miss. Code Ann. § 37-61-19 (1972).

The appellees argue that the statute applies since no amount of money can be available to be appropriated for an illegal purpose. The argument is persuasive. However, regarding the activity bus purchases, we find the purpose itself to be a lawful one, the purchase of transportation equipment. It is the manner of acquisition which we find to be unauthorized by law. Therefore, as applied to the facts of this case, we do not find the requisite clear intent for liability in § 37-61-19. See Entrican v. King, 289 So.2d 913, 914 (Miss. 1974).
The liability principles which we apply in this case have their roots in the common law from Paxton v. Baum, 59 Miss. 531 (1882), and its progeny.
[7] The intervenor action was initiated on October 17, 1986. Final judgment was entered on May 4, 1990. Over approximately three and one half (3 1/2) years, the original deposit of $266,148.00 had earned accrued interest bringing the total payout to $344,352.44.
[8] See Miss. Code Ann. § 37-7-301(d) (Revised 1990).